[Crim. No. 18510. In Bank. July 31, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARDO RINCON-PINEDA, Defendant and Appellant.

**COUNSEL**

Richard S. Buckley, Public Defender, Harold E. Shabo, Sam Gordon and Martin Stein, Deputy Public Defenders, for Defendant and Appellant.

Marvin W. Friedman as Amicus Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman

H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

Mildred W. Levin, Jettie Pierce Selvig, Camille E. LeGrand, Jill Jakes, Fred Okrand, Mark D. Rosenbaum and Daniel C. Lavery as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—The judgment here under review arose from the wanton and brutal rape of a young woman who lived alone near defendant's temporary residence. As is often typical of such a crime, it was witnessed by no one other than the victim and the rapist. Owing to this circumstance, to the trauma inflicted on the victim and to legal principles of long standing legitimacy, the treatment of the victim during the prosecution of the defendant was also quite typical of that heretofore accorded those unfortunate enough to fall victim to this sorry genre of crimes.

The trial judge was of the opinion that a once unimpeachable rule of law could not appropriately be applied to circumstances such as those present herein. Because he considered it to be demeaning of the victim in the instant case, the judge refused to deliver to the jury a cautionary instruction which originated in the 17th century and which reflects adversely on the credibility of the complaining witness in a prosecution for sexual assault. The judge's failure to so instruct the jury is the sole objection before us on this appeal. We have previously held the instruction in issue to be mandatory, and the omission of the instruction was accordingly erroneous. However, upon reviewing the evidence before the jury we conclude that the error was not prejudicial. Moreover, we are of the opinion that as presently worded the instruction is inappropriate regardless of the particular evidence which might be adduced at trial. Since defendant herein was accorded plenary due process and nevertheless was found by a jury on the basis of substantial evidence to have committed the rape and related sexual assaults testified to by the victim, we affirm the judgment below.

### I

The victim testified that on the night of July 9, 1973, she retired at her customary hour of 11 p.m. At approximately 3 a.m. the following morning, she awakened to find a person lying beside her in her bed. As she screamed "Who is it?" she turned on a 100-watt bedside lamp and recognized defendant as the intruder.

The victim lived in the middle building of three contiguous dwellings. At the front, on the street, lived the owner of all three buildings. Behind his house was the victim's one ƀedroom cottage, and behind her cottage was a bungalow rented to several individuals of Mexican descent. Although she had never spoken to him previously, the victim recognized defendant as one who had been living behind her cottage for the past few weeks.

Defendant had apparently gained ingress through the window the victim always left open for the use of her pet cats. Drawing a robe around her partially nude body, the victim, in broken Spanish, ordered defendant to leave. When he did not respond, she began to scream. Defendant grabbed her, tried to cover her mouth, and indicated his intention to have intercourse with her. The victim ran screaming from the bedroom into the kitchen, where the open window was located. Defendant, however, caught the victim, jammed a hand in her mouth, beat her about the face until she stopped screaming, and then began to choke her. Having hitherto scratched and clawed at defendant's face, the victim realized her life was in great danger, and ceased resisting. Lest defendant discover the knives hanging directly above her head, which was then pressed against the kitchen floor, the victim inveigled defendant into going into the living room by muttering that it was "mas suave," or softer, since it was carpeted. The victim, whose principal concern was now to survive, then submitted to approximately a dozen acts of sexual assault over the ensuing two or three hours, including intercourse, oral copulation, and attempted sodomy.

In the course of these acts the victim sought to avoid further bodily harm by befriending her assailant. Telling him of a Spanish girl she tutored, she sought to get him to agree to help her in the girl's tutoring. Although the defendant had difficulty throughout this period in maintaining an erection, he did not appear to be intoxicated. Once she had succeeded in convincing defendant that his return would be welcomed, the victim persuaded him to leave on the pretext that she had to go to work. Defendant thereupon moved the victim back into the bedroom. After cautioning the victim against reporting her rape, defendant left.

Following her initial bedside identification of defendant, the victim and defendant had moved into unlit portions of her home. When defendant moved back into the bedroom during the final stages of the assault, however, he moved back into the strong illumination of the bedside lamp. Moreover, the victim had an additional opportunity for

identification of defendant when she let him out her front door into the early light of dawn. The victim was absolutely positive in her identification of defendant at trial as the perpetrator of the crimes against her.

To be consistent with her tale to the defendant that she had to go to work, and to avoid being overheard should defendant have remained lurking outside, the victim left her home and drove to a telephone booth where she called an attorney friend for comfort and advice. Meeting him at his office, a converted dwelling, she showered there and then sought solace in conversation for about two hours. After calling her doctor and her employer, she and her friend prepared to return to her residence. They telephoned ahead to advise the landlord, Mr. Wek, of what had happened. When they arrived at her residence they went to Wek's house and again discussed the matter with him. After Wek had determined that defendant was still at the rear house, the victim called the police.

The arresting officer testified that after having spoken with the victim he approached defendant's bungalow and apprehended defendant in the act of leaving it. Defendant was wearing two pairs of trousers and had two sets of underwear rolled up in his jacket. The victim identified defendant as her assailant and he was formally arrested. At this time, defendant appeared to the arresting officer to be sober.

Shortly before noon on the day of the rape, the victim was examined by a doctor who testified at trial that "she had multiple bruises all over her body, especially over the face, nose, lips, the front side of her neck, over the left pelvic region, over the right frontal scalp region, and one tooth in the left upper front side of the jaw was loosened." Pictures of these injuries were in evidence at trial. Because no internal ejaculation had taken place and because the victim had taken a shower since the assault, no attempt was made to gain medical evidence of her having been sexually assaulted.

At the time of his arrest defendant had a prominent scratch or abrasion on his forehead of clearly recent origin. A photograph of this scratch was placed in evidence at trial. There was also evidence of a possible admission by defendant. While in custody at the police station on the day after his arrest, defendant was notified through an interpreter of his rights, and after waiver thereof was asked some questions concerning his conduct on the previous night. The interpreter testified that defendant could not explain how he had gotten the bump or scratch

on his head. Defendant kept saying that he had been drunk. The interpreter testified: "I asked the defendant if he had done this thing that he was being charged with, he said if he did, he was very drunk when he did it. . . . [H]e said he was very drunk, if he did do this, he was really embarrassed, his family back in Mexico, something to that effect."[1]

There was no apparent official effort to obtain other evidence corroborating the victim's accusation of defendant, however. No evidence was presented by the prosecution or defense as to there having been any attempt to gather scientific evidence from either the scene of the crime, such as fingerprints, or from defendant's person and clothing, such as tissue or fiber traces.

Defendant testified in his own defense that he was 24 years of age and had entered the United States illegally six weeks before his arrest, leaving his wife and three children in Mexico while he sought employment in Los Angeles. He had joined his brother and several other illegal aliens at the bungalow behind the victim's cottage. He had seen her but had never spoken to her. He had spent the day before his arrest drinking with his companions in a neighborhood bar. He had no personal recollection of making his way back from the bar, but had been told by his friends the following morning that he had been helped home between 1 a.m. and 2 a.m. and had hit his head on a door or gate to the bungalow. After all but one of his companions had left for work at 6 a.m. defendant had returned to sleep until he had been awakened by Mr. Wek, the landlord. Wek was inquiring who had molested the victim, and seeing the scratch on defendant's forehead, had accused defendant. Defendant had denied the accusation. When he heard the police arriving, however, he knew he would surely be arrested as an illegal alien, so he grabbed his extra clothes. Defendant denied that he was trying to flee when arrested. Defendant was able to produce none of his ostensible drinking companions as all allegedly had fled to avoid arrest as illegal aliens. Defendant swore that he had remained faithful to his wife since leaving Mexico, and had never engaged in, or had had any desire to engage in, the unnatural acts described by the victim.

The only other witness for the defense was the landlord, Mr. Wek, whose rather disjointed testimony described his going back to the

---

[1] The interpreter was not sure he had informed defendant of the full details of the charges against him. However, both defendant and Mr. Wek testified that Wek had accused defendant of "bothering" or "molesting" the "lady in front." Thus it is unlikely that defendant, in apparently admitting that he might have done something embarrassing while drunk, was referring merely to the embarrassment of getting arrested.

bungalow rented to the Mexicans, seeing defendant on the couch with a scratch on his forehead and asking him in Spanish if he had "bothered the lady." Wek testified that defendant at that time "was drunk. He was normal." Wek also testified that there had been drinking going on the previous day among defendant and his companions, and that he could not have heard the victim's screams from his bedroom that night.

On this evidence, the jury found defendant guilty of rape (Pen. Code, § 261), oral copulation (Pen. Code, § 288a), and attempted sodomy (Pen. Code, §§ 286, 664). Defendant was acquitted of burglary. (Pen. Code, § 459.) Defendant was sentenced to state prison for the terms prescribed by law, to be served concurrently, the longest such term of imprisonment being the three-years-to-life prescribed for rape (Pen. Code, § 264).

## II

There were in fact two trials of defendant. The first trial, which ended in a hung jury, had involved substantially the same evidence as the second. There were important differences in the evidence at the two trials, however. The victim was more specific at the second trial on the strength of the illumination which allowed her to identify her assailant, and the defendant's admissions to the police interpreter were described at the first trial as extending only to the facts that defendant had been drinking on the night in question and had little recollection of what had transpired—there was no "if I did it I was drunk" admission in evidence at the first trial. The first trial also differed in that defense counsel inquired in some detail into the victim's past sexual life, and the court accordingly instructed the jury at the first trial:

"Evidence was received for the purpose of showing that the female person named in the information was a woman of unchaste character.

"A woman of unchaste character can be the victim of a forcible rape but it may be inferred that a woman who has previously consented to sexual intercourse would be more likely to consent again.

"Such evidence may be considered by you only for such bearing as it may have on the question of whether or not she gave her consent to the alleged sexual act and in judging her credibility." (CALJIC No. 10.06.)

The first trial court also read to the jury the text of CALJIC (Cal. Jury Instns., Crim. (3d ed. 1970)) No. 10.22, the cautionary instruction which

though originally required only in cases involving charges of forcible rape (see *People* v. *Benson* (1856) 6 Cal. 221) has since been held mandatory, *sua sponte,* in all sex offense cases (*People* v. *Merriam* (1967) 66 Cal.2d 390, 395 [58 Cal.Rptr. 1, 426 P.2d 161]; *People* v. *Nye* (1951) 38 Cal.2d 34, 40 [237 P.2d 1])

"A charge such as that made against the defendant in this case is one which is easily made and, once made, difficult to defend against, even if the person accused is innocent.

"Therefore, the law requires that you examine the testimony of the female person named in the information with caution."

Given the overall context of the first trial, there was as much truth as irony in a slip of the tongue by the arresting officer during his testimony at that trial. When asked to identify several photographs of the victim showing the injuries inflicted by her assailant, the officer replied: "In these photographs is a picture of the defendant in different positions." The victim too seemed to feel that it was she who had been the defendant in the first trial. At the second trial, the victim was herself represented by counsel and refused to answer questions as to her past sexual conduct.

Defense counsel did not seek a ruling by the court at the second trial to force the victim to answer inquiries about her chastity, but did attempt to play on the point during closing argument by styling the victim's concern for her privacy as "arrogant" and "insulting" and indicative of "emotional instability," such that her testimony against the defendant was "just acting a fantasy role."

Although the jury was given CALJIC No. 10.06 in modified form,[2] the court refused over defense objection to give the cautionary instruction, CALJIC No. 10.22. The court acknowledged that the instruction was

---

[2]The first sentence of CALJIC No. 10.06 was changed to read: "*From the evidence it may be interpreted* that the female person named in the information was a woman of unchaste character. . . ." This instruction grew out of the court's ruling in chambers, apparently in light of former Evidence Code section 1103, subdivision (a), that limited inquiry would have to be permitted into the victim's sexual conduct during the year preceding her rape. (Cf. Stats. 1974, ch. 569, pp. 440-442, adding Evid. Code, § 782 and amending Evid. Code, § 1103.) The victim was at this point no longer available to testify, however, and was about to leave the jurisdiction. Defense counsel felt there was in any event an inference of lack of chastity to be drawn from the existing record. The trial court decided that it was in the inerests of justice to give CALJIC No. 10.06 as modified rather than to compel the victim to return for further testimony and then to decide the applicability of CALJIC No. 10.06 in light of such testimony.

mandatory in sex cases, but noted that its compulsory use had not been authoritatively reexamined for decades.

## III

We will proceed in subsequent portions of this opinion to reexamine the validity of the cautionary instruction which in prior opinions we have decreed to be mandatory in sex offense cases. That discussion should not obscure the fact that the trial court in the instant case committed error in failing to comply with controlling precedent. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455-456 [20 Cal.Rptr. 321, 369 P.2d 937]; see also *People* v. *Triggs* (1973) 8 Cal.3d 884, 890-891 [106 Cal.Rptr. 408, 506 P.2d 232].) Defendant was entitled to have his trial conducted in accordance with the law prevailing at that time, and if it were "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error" (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), it would be our duty to reverse the judgment against defendant.

It is well established that the error in failing to give the cautionary instruction is not prejudicial per se. "The circumstances of each case" must be reviewed on appeal to "determine whether failure to give the instruction was prejudicial." (*People* v. *Nye, supra,* 38 Cal.2d at p. 40.) Such failure "does not constitute prejudicial error if 'the evidence clearly points to the defendant's guilt, or . . . the testimony of the prosecuting witness is amply corroborated, or there are other factors in the case which show that the defendant has been given a fair trial.' " (*People* v. *Merriam, supra,* 66 Cal.2d at p. 395.) Under this standard, a finding that failure to give the instruction was harmless error has been far more the rule than the exception. (See *People* v. *Hernandez* (1971) 18 Cal.App.3d 651, 659-660 [96 Cal.Rptr. 71]; *People* v. *Sutton* (1964) 224 Cal.App.2d 708-712 [37 Cal.Rptr. 23]; cf. *People* v. *Cady* (1968) 267 Cal.App.2d 189, 193-194 [72 Cal.Rptr. 772] (concurring opn.).)

We cannot in the instant case attribute probable prejudice to the omission of the cautionary instruction. The fact of defendant's prior mistrial is by no means dispositive; while it is true that the hung jury therein had been properly instructed, it also had before it evidence which, even when viewed most favorably to the People, was less persuasively probative of guilt. (See *ante,* p. 870.) In light of counsel's arguments the conflicting accounts of fact offered by the victim and the

defendant at the second trial stood out in sharp relief against the rest of the evidence. Defendant was accorded a full measure of modern due process; he stood before the jury represented by counsel, clothed in the presumption of innocence, and shielded by the need for his guilt to be established beyond reasonable doubt ere he could be convicted. Conviction necessarily entailed according credence to the victim's identification, but that identification was premised upon ample opportunity for perception of the perpetrator of the rape, was corroborated to some extent by the injury to defendant's forehead and defendant's extrajudicial disclaimer of responsibility while intoxicated, and was free of even a hint of the taint of racial or sexual prejudice or of a blind urge for retribution. In fact, conviction did not even entail complete rejection of defendant's testimony, which insofar as it refuted that of the victim consisted entirely of the hearsay assertions of phantom friends.

 Under the circumstances here present we cannot say that there is a substantial probability that a jury which had properly been given the cautionary instruction would have been any more aware than was the jury which convicted defendant that the key issue in the case was the credibility of the complaining witness. It follows that the trial court's error was not prejudicial, and did not result "in a miscarriage of justice" (Const., art. VI, § 13). Defendant's conviction must accordingly be affirmed.

IV

By reason of the issue presented on appeal we have decided that the time is ripe for review of the cautionary instruction which should have been given at defendant's trial, to the end of determining whether it should continue to be mandated in the trial of every case involving a charge of a sex offense. We begin by examining the evolution of such an instruction in sex offense cases into a fixture of California law.

The instruction has its origin in the writings of Sir Matthew Hale, Lord Chief Justice of the Court of King's Bench from 1671 to 1676, which were published posthumously in 1736. Hale dealt at length with rape as the epitome of a statutory felony, reciting the legislative and decisional evolution of the law to his day. After a technical discussion of what constituted rape and who might perpetrate it, Hale turned to the evidence competent to prove a charge of rape. This passage consisted of two parts. First, Hale stated the proposition that "[t]he party ravished may give evidence upon oath, and is in law a competent witness; but the credibility of her testimony, and how far forth she is to be believed, must

be left to the jury, and is more or less credible according to the circumstances of fact that concur in that testimony." (1 Hale, History of the Pleas of the Crown (1st Am. ed. 1847) p. 633.)

Only after stating this proposition and discussing the circumstances, e.g., the length of time before the making of a report, the injuries as a token of resistance, etc.—lending greater or lesser credibility to a prosecutrix, did Hale conclude that passage by touching upon the "considerable" question whether prosecutrices under the age of 12 should be allowed to testify at all. Hale's recommendation was that such a victim's story should always be put before the jury, under oath if the court in its discretion felt the witness qualified to be sworn, but otherwise as an unsworn statement. It was in this context that Hale went on as follows, culminating in the first half of his famous "instruction":

"But in both these cases, whether the infant be sworn or not, it is necessary to render their evidence credible, that there should be concurrent evidence to make out the fact, and not to ground a conviction singly upon such an accusation with or without oath of an infant.

"For in many cases there may be reason to admit such witnesses to be heard, in cases especially of this nature, which yet the jury is not bound to believe; for the excellency of the trial by jury is in that they are the triers of the credit of the witnesses as well as the truth of the fact; it is one thing, whether a witness be admissible to be heard, another thing, whether they are to be believed when heard.

"It is true rape is a most detestable crime, and therefore ought severely and impartially to be punished with death; but it must be remembered, that it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, tho never so innocent." (1 Hale, *supra*, at p. 635.)

Hale then recounted several examples of prosecutions for rape which proved to have been maliciously instigated by false accusations, and concluded the chapter with the prescription of caution upon which the second half of the instruction herein at issue is based: "I only mention these instances, that we may be the more cautious upon trials of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance; the heinousness of the offense many times transporting the judge and jury with so much indignation, that they are over hastily carried to the conviction of the

person accused thereof, by the confident testimony sometimes of malicious and false witnesses." (1 Hale, *supra,* at p. 636.)

Hale's musings were introduced somewhat obliquely into the law of California by *People* v. *Benson, supra,* 6 Cal. 221, involving a 13-year-old prosecutrix with a circumstantially improbable claim of rape and apparent malice against the defendant. In the course of ruling that evidence of specific instances of prior lewd conduct by the prosecutrix should have been admitted at trial—the apparent basis for the reversal of the judgment below—the court declaimed that:

"There is no class of prosecutions attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenceless, and Courts, in view of the facility with which charges of this character may be invented and maintained, have been strict in laying down the rule which should govern the jury in their finding.

"From the days of Lord Hale to the present time, no case has ever gone to the jury, upon the sole testimony of the prosecutrix, unsustained by facts and circumstances corroborating it, without the Court warning them of the danger of a conviction on such testimony." (*Id.,* at p. 223.)

In the wake of *Benson,* it became the rule in California that upon request (*People* v. *Rangod* (1896) 112 Cal. 669, 672 [44 P. 1071]) cautionary instructions reflecting the *Benson* reading of Hale were to be given in rape cases "either when the prosecutrix is a child of tender years or when her testimony is uncorroborated." (*People* v. *Caldwell* (1921) 55 Cal.App. 280, 298 [203 P. 440]; see also *People* v. *Scott* (1914) 24 Cal.App. 440, 443-444 [141 P. 945].) Such instructions were disapproved, however, in *People* v. *Anthony* (1921) 185 Cal. 152, 160 [196 P. 47], wherein we declared: "The statements that it is particularly difficult for a defendant to clear himself of such a charge, that no charge is more easily made or more difficult to disprove, and that the two parties are usually the only witnesses to the act, are statements of fact, not of law . . . [and] are not proper in an instruction to the jury . . . ."

This denunciation apparently reflected article VI, section 19, of the California Constitution of 1879, which provided: "Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." This section was amended in 1934 by language substantially identical to that now found in article VI, section 10, of the

California Constitution as amended in 1966: "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." Under this provision the cautionary instruction came into full flower.

In *People* v. *Lucas* (1940) 16 Cal.2d 178, 181-182 [105 P.2d 102, 130 A.L.R. 1485], we disavowed *Anthony* and declared, in the context of a prosecution for contributing to the delinquency of a minor through sexual acts, that "We are firmly of the view that in all cases of this character a defendant should be afforded the benefit of a cautionary instruction as was here requested to the general effect that such a charge is easily made and difficult to disprove for which reason the testimony of the prosecuting witness should be examined with caution." Then in *People* v. *Putnam* (1942) 20 Cal.2d 885, 891-892 [129 P.2d 367], we held in a similar context that such an instruction was to be given *sua sponte:* "No corroboration is required in cases like the present one since it is ordinarily precluded by the very nature of the offense. [Citations omitted.] The rule permitting a conviction on the uncorroborated testimony of the prosecuting witness is necessary to protect the public but it needs a counterweight to protect the accused. The policy that requires the court to instruct of its own motion on the law relative to corroboration [where corroboration is required] imposes a corresponding duty to give cautionary instructions, for the very secrecy that precludes corroboration also precludes effective denial. The ordinary reaction to an accusation of a sex offense usually committed in secret is that the offense has been committed, and a necessary safeguard against injustice is a warning to view such accusations cautiously."

Any doubt of the applicability of the *Putnam* rule to cases not involving offenses with children was removed by the reaffirmation of *Putnam* in *People* v. *Nye, supra,* 38 Cal.2d at page 40, a case concerning two assaults on mature women with intent to commit rape. "Even if a cautionary instruction is not requested by the defendant, it is incumbent upon the court in cases such as this to give such an instruction on its own motion whether the alleged victim is a child or a mature person. . . . Whether the prosecuting witness is a child or a mature person, the verdict will ordinarily turn on whether the jury believes the defendant's or the victim's version of the occurrence, and there is the same danger of misinterpreting the defendant's acts as well as the danger of spite, blackmail, vindictiveness, private vengeance, neurotic fabrication or fanciful imagination." Since our decision in *Nye,* we have made clear

that the mandatory cautionary instruction is applicable to virtually all criminal prosecutions involving illicit sexual conduct. (*People* v. *Merriam, supra,* 66 Cal.2d at pp. 394-395; cf. *People* v. *McCracken* (1952) 39 Cal.2d 336, 349-350 [246 P.2d 913]; *People* v. *McGhee* (1954) 123 Cal.App.2d 542, 543-545 [266 P.2d 874].)

## V

In light of our foregoing examination of the evolution of the cautionary instruction, and with the benefit of contemporary empirical and theoretical analyses of the prosecution of sex offenses in general and rape in particular, we are of the opinion that the instruction omitted below has outworn its usefulness and in modern circumstances is no longer to be given mandatory application.

As we observed, Sir Matthew Hale himself was convinced that the best test of the credibility of a prosecutrix was the surrounding circumstances, including any corroborating evidence, of a particular case. Moreover, Hale affirmed the "excellency" of leaving the question of credibility to the jury. It is true that Hale urged caution in rape prosecutions, but he did so in the context of three propositions: that otherwise incompetent, infant witnesses should be allowed to address the jury, that he had personally witnessed the malicious prosecution of fabricated allegations of rape, and that rape in general aroused passions ill-suited to fair adjudication. Even if accepted at face value, we find nothing in Hale's writings to suggest that, as a matter of course, juries should be instructed that those who claim to be victims of sexual offenses are presumptively entitled to less credence than those who testify as the alleged victims of other crimes. The credibility of a witness, by Hale's lights as by ours, is to be determined by the circumstances of the alleged crime and the narration of it by the witness, and these circumstances vary markedly from case to case.

Even if the mandatory instruction here in issue did square with Hale's analysis, the changes in criminal procedure wrought in the intervening 300 years would suffice of themselves to sap the instruction of contemporary validity. It has been suggested that Hale's concern over fabricated rape prosecutions was a product of the accused's incompetence to testify in his own defense. (See Fricke & Alarcon, Cal. Criminal Procedure (8th ed. 1974) p. 384.) But the accused's incompetency was one of form only; he was allowed, and indeed was expected to address the jury in an unsworn statement responsive to the evidence against him. (1 Stephen,

History of the Criminal Law of England (1883) p. 440; 2 Wigmore, Evidence (3d ed. 1940) §§ 575, 579, pp. 684, 702-703.)

There are other, more dramatic differences in the position of the criminally accused in the United States today from one so accused in 17th century England. The fundamental precepts of due process, that an accused is presumed innocent and is to be acquitted unless proven guilty beyond a reasonable doubt (see *In re Winship* (1970) 397 U.S. 358, 361-364 [25 L.Ed.2d 368, 373-375, 90 S.Ct. 1068]; *Coffin* v. *United States* (1895) 156 U.S. 432, 453-456 [39 L.Ed. 481, 491-492, 15 S.Ct. 394]), were recognized as desiderata in Hale's era but had yet to crystallize into rights. (See *Coffin* v. *United States, supra,* 156 U.S. at pp. 454-459 [39 L.Ed. at pp. 491-493].) The rights of an accused to present witnesses in his defense and to compel their attendance, subsequently enshrined in the Sixth Amendment, were barely nascent in the 17th century. (2 Wigmore, *supra,* § 575, p. 685.) Most importantly of all, in the context of a rape case, one accused of a felony in Hale's day had no right whatsoever to the assistance of counsel (2 Wigmore, *supra,* § 575, p. 684), while today he is constitutionally entitled to such assistance regardless of his personal means (*Gideon* v. *Wainwright* (1963) 372 U.S. 335, 339-345 [9 L.Ed.2d 799, 802-806, 83 S.Ct. 792, 93 A.L.R.2d 733]). Considering that under the Anglo-Saxon adversarial system of justice "[when a prisoner is undefended his position is often pitiable, even if he has a good case" (1 Stephen, *supra,* at p. 442), we recognize that there may well have been merit to Hale's assertion that a prosecution for rape was an ideal instrument of malice, since it forced an accused, on trial for his life, to stand alone before a jury inflamed by passion and to attempt to answer a carefully contrived story without benefit of counsel, witnesses, or even a presumption of innocence. But the spectre of wrongful conviction, whether for rape or for any other crime, has led our society to arm modern defendants with the potent accouterments of due process which render the additional constraint of Hale's caution superfluous and capricious.

Even by Hale's own terms, every allegation of rape was not to be viewed as a potential fabrication. The *Benson* case introduced Hale's caution into California law as applicable solely to cases where the *only* evidence was the accusatory testimony of the prosecutrix. Indeed, the cautionary instruction was cited as a "counterweight" to the "rule permitting a conviction on the uncorroborated testimony of the prosecuting witness" (*People* v. *Putnam, supra,* 20 Cal.2d at p. 892) in the very case which paradoxically held such an instruction to be compulsory

regardless of any amount of corroboration of the testimony of the prosecuting witness. The justification for the compulsory nature of the instruction is thus an echo from Hale: that sex offense cases involve what "must be conceded [to be] the kind of act [which] is so thoroughly repugnant to the average person that it can breed that righteous outrage which is the enemy of objective fact finding. In addition, the shocking nature of the act might well lead a complaining witness to hasty identification of the alleged perpetrator." (*People* v. *Merriam, supra,* 66 Cal.2d at p. 395.)

We next examine whether such a charge is so difficult to defend against as to warrant a mandatory cautionary instruction in the light of available empirical data. (See generally Note, *The Rape Corroboration Requirement: Repeal Not Reform* (1972) 81 Yale L.J. 1365, 1378-1384.) Of the FBI's four "violent crime" offenses of murder, forcible rape, robbery, and aggravated assault, forcible rape has the highest rate of acquittal or dismissal. (FBI, Uniform Crime Reports 1973 (1974) table 18, p. 116; see also, *id.,* at p. 35 [same result as to adult suspects only].)[3] Equally striking is the ranking of forcible rape at the bottom of the FBI's list of major crimes according to percentage of successful prosecutions for the offense charged. "Sixty-nine percent of those persons prosecuted for the offense of larceny were found guilty of that offense in 1973. This was followed by burglary with 49 percent found guilty of the original charge, 46 percent for robbery, 45 percent for murder, 43 percent for auto theft, 39 percent for aggravated assault, and 36 percent for forcible rape." (*Id.,* at p. 35.) As to sex offenses other than forcible rape and prostitution, the percentage of prosecutions ending in acquittal or dismissal is almost 50 percent higher than the average for all major crimes. (*Id.,* table 18, p. 116.) A similar situation is indicated by California crime statistics, which show forcible rape to have an acquittal rate second only to bookmaking, with prosecutions for other sex offenses resulting in acquittal or dismissal more frequently than the average for all felonies. (Cal. Dept. of Justice, Crime and Delinquency in Cal., 1972, Adult Prosecution reference tables (1973) [hereinafter Crime and Delinquency Tables] table 9, p. 16.)[4]

---

[3]These figures represent the dispositions of only those cases in which a suspect was actually formally charged. Thus they do not reflect an additional barrier to prosecution of a rape charge: the victim's convincing the police that the legal elements of the crime have occurred. "As a national average, 15 percent of all forcible rapes reported to police were determined by investigation to be unfounded. In other words, the police established that no forcible rape offense or attempt occurred. This is caused primarily due to the question of the use or threat of force frequently complicated by a prior relationship between victim and offender." (FBI, Uniform Crime Reports 1973 (1974) p. 15.)

[4]At oral argument on this appeal, counsel for defendant contended that California statistics are not comparable to national statistics regarding the relative difficulty of

These findings are consistent with the leading study of jury behavior, which found that "the jury chooses to redefine the crime of rape in terms of its notions of assumption of risk," such that juries will frequently acquit a rapist or convict him of a lesser offense, notwithstanding clear evidence of guilt. (Kalven & Zeisel, The American Jury (1966) p. 254.) This tendency is especially dramatic in the situation supposedly most conducive to fabricated accusations: where the prosecutrix and the accused are acquainted, and there is no "evidence of extrinsic violence" to the prosecutrix. (*Id.,* at p. 252.) The jury "closely, and often harshly, scrutinizes the female complainant and is moved to be lenient with the defendant whenever there are suggestions of contributory behavior on her part," sometimes carrying "to a cruel extreme," in cases "clearly aggravated by extrinsic violence," its tendency towards leniency for accused rapists. (*Id.,* at pp. 249, 251.) The same study found that the jury was also prone to seize upon mitigating factors in other sex offense cases so as to be lenient with defendants, as with indecent exposure to an adult, or the statutory rape of a previously unchaste minor. (*Id.,* at pp. 273-280.)

The low rate of conviction of those accused of rape and other sexual offenses does not appear to be attributable to a high incidence of unwarranted accusations. Rape in particular has been shown by repeated studies to be grossly under-reported. (See, e.g., FBI Uniform Crime Reports 1973, *supra,* at p. 15; LeGrand, *Rape and Rape Laws: Sexism in Society and Law* (1973) 61 Cal.L.Rev. 919, 921; Note, *supra,* 81 Yale L.J. at pp. 1374-1375; Amir, Patterns in Forcible Rape (1971) pp. 27-28.) The initial emotional trauma of submitting to official investigatory processes, the fear of subsequent humiliation through attendant publicity and embarrassment at trial through defense tactics which are often demeaning, and a disinclination to encounter the discretion of the police in deciding whether to pursue charges of rape, especially with regard to what may appear to the police to be "victim-precipitated" rapes, are among the powerful yet common disincentives to the reporting of rape. (See *ante,* pp. 870-871; Medea & Thompson, Against Rape (1974) pp. 111-121; Astor, The Charge is Rape (1974) pp. 169-188; Note, *The Victim*

---

securing a conviction for forcible rape. We have cited above to statistics showing forcible rape to have the second highest acquittal rate of any offense in California. These statistics also show rape to have the third highest rate of acquittals and dismissals combined, trailing only bookmaking and weapons charges: the actual figures are 9.1 percent of rape charges dismissed by the superior court, and 11.3 percent acquitted after trial. The conviction rate in California for forcible rape is lower than that for 17 of the other 19 classes of common felonies listed, including wilful homicide, robbery, burglary, and assault. (Crime and Delinquency Tables, *supra,* table 9, p. 16.)

*in a Forcible Rape Case: A Feminist View* (1973) 11 Am.Crim.L.Rev. 335, 348-351; Amir, *supra,* at p. 29; MacDonald, Psychiatry and the Criminal (2d ed. 1969) p. 238; Amir, *Victim Precipitated Forcible Rape* (1967) 58 J.Crim.L.C. & P.S. 493.) Those victims with the pluck to disregard such disincentives discover the utter fallaciousness of the conventional wisdom that rape is a charge easily made. A large number of reports of rape are deemed "unfounded" by the police and are pursued no further: the percentage has been set variously at 15 percent (see *ante,* fn. 3), 20 percent (see Comment, *Police Discretion and the Judgment That A Crime Has Been Committed—Rape in Philadelphia* (1968) 117 U.Pa.L.Rev. 277, 281), 25 percent (MacDonald, *supra,* at p. 239), and 29 percent (Amir, *supra,* at p. 29).

Even when an arrest is made, the charge may well proceed no further. In 1972 in California 28 percent of those arrested for rape were released outright by the police. (Testimony of David G. Miller, senior crime studies analyst, Bureau of Crim. Stat., Cal. Dept. of Justice, in Transcript of the Hearing before the Assem. Crim. Justice Com. and the Cal. Commission on the Status of Women (Los Angeles, Oct. 18, 1973) at p. 48.)[5]

Once a rape case does wend its way into the courts, there are factors besides jury leniency to account for the inconsistency between the high acquittal rate and the myth of rape charges being not only easy to bring, but also hard to defend against. Kalven and Zeisel found, in the course of their nationwide jury studies, that eyewitness evidence was presented by the defense in rape prosecutions more frequently than in burglary, narcotics, or drunk driving prosecutions. (Kalven & Zeisel, *supra,* table 41, p. 143.) The likelihood of the trial turning on a credibility contest between the accused and his accuser was as great in a case of nonsexual assault as in a case of rape. The victim testified in 94 percent of assault prosecutions, the defendant in 96 percent while the victim testified in 97 percent of rape prosecutions and the defendant did so in only 85 percent.

---

[5]Mr. Miller also testified that either felony or misdemeanor complaints were ultimately filed against 69 percent of those arrested for rape in 1972. The felony complaints filed against 16 percent of the adults arrested for forcible rape in 1972 were disposed of at the preliminary hearing stage, with 35 percent of such dispositions being convictions, presumably upon pleas of guilty or pleas to misdemeanor offenses. Thus about 10 percent of those arrested for forcible rape appear to have had felony charges against them dismissed at their preliminary hearings. (Transcript of Oct. 18, 1973, *supra,* at pp. 48-49.) Of the entire number arrested for forcible rape in 1972, only about one-third ever appeared before the superior court on resulting felony charges, and only about 12 percent were actually convicted of forcible rape (Pen. Code, § 261), attempted rape (Pen. Code, §§ 261, 664), or assault with intent to commit rape (Pen. Code, § 220). (*Id.,* at pp. 49-50; cf. *ante,* fn. 4.)

(*Id.,* tables 40-41, pp. 142-143.) And it was the defendant in a narcotics case rather than a rape case who was most likely to appear as the only witness for the defense. (*Id.,* tables 39, 41, pp. 141, 143.)

It is a significant measure of the difficulty of proving rape that in not a single one of the 72 rape cases studied by Kalven and Zeisel did the prosecution rely exclusively on the testimony of the complaining witness. (*Id.,* table 39, p. 141.) Indeed, the prosecution turned to expert evidence in rape cases more frequently than in burglary, drunk driving and assault cases. (*Id.,* table 40, p. 142.) Scientific evidence has for decades been a recognized if under-utilized resource for the proof of rape. (See LeGrand, *supra,* 61 Cal.L.Rev., at pp. 930-931; Amir, Patterns in Forcible Rape, *supra,* p. 24, fn. 5, pp. 176-177; Rife, *Scientific Evidence in Rape Cases* (1940) 31 J.Crim.L. & C. 232.)

Since it does not in fact appear that the accused perpetrators of sex offenses in general and rape in particular are subject to capricious conviction by inflamed tribunals of justice, we conclude that the requirement of a cautionary instruction in all such cases is a rule without a reason. To the extent that they make such an instruction mandatory, our decisions in *People* v. *Merriam, supra,* 66 Cal.2d 390, *People* v. *Nye, supra,* 38 Cal.2d 34, *People* v. *Putnam, supra,* 20 Cal.2d 885, and *People* v. *Lucas, supra,* 16 Cal.2d 178, are no longer to be followed.

## VI

We now turn to the question whether the instruction may be given discretionarily by a trial court. Having already noted the fundamental differences in the position of the defendant before the bar of modern American justice as opposed to the English prisoner's dock of 300 years ago, and having dispensed with the notion that those accused of sex offenses suffer any special prejudice today, we think the instruction as it has customarily been worded (i.e., CALJIC No. 10.22) is inappropriate in any context, and the further use of such language is hereby disapproved.[6] (Accord, *State* v. *Feddersen* (Iowa 1975) 230 N.W.2d 510, 516.)

---

[6]We are aware that as of 1974 the second paragraph of CALJIC No. 10.22 has been revised to eliminate reference to "the female person named in the information" and now states: "Therefore, the law requires that you examine with caution the testimony of the person alleged to have been raped." (Cal. Jury Instns., Crim. (3d ed. 1970) No. 10.22 (1974 Supp., p. 120).) Although perhaps more courteous, we find CALJIC No. 10.22 as revised no more satisfactory than its predecessor. The instruction still impermissibly

Whatever might have been its historical significance, the disapproved instruction now performs no just function, since criminal charges involving sexual conduct are no more easily made or harder to defend against than many other classes of charges, and those who make such accusations should be deemed no more suspect in credibility than any other class of complainants. When such prosecutions present close evidentiary questions, they do so not because a victim—generally a woman—claims to have been sexually assaulted or abused, but because the alleged crime took place in evanescent circumstances difficult to reconstruct in court, a happenstance which may plague prosecution of any crime involving specific intent, and which is indeed a typical occurrence in such non-sexual crimes as fraud and narcotics transactions. A cautionary instruction bred in the circumstances of 17th century criminal rape and criminal justice need not be disinterred in a contemporary California courtroom in order to insure that a defendant faced essentially by a single accuser will not be casually convicted without due consideration of the relative weight of the evidence.

It has been suggested by amicus curiae for defendant that the potential for an erroneous verdict of guilt upon the uncorroborated testimony of a complaining witness may be minimized by our propounding, in lieu of CALJIC No. 10.22, some sort of cautionary instruction to be given in any prosecution in which the case against the defendant "substantially rests upon the testimony of the complaining witness" uncorroborated by "substantial evidence." Similar proposals have been aired in the legislative forum. (See Assem. Bill No. 1595 (1975-1976 Reg. Sess.); Assem. Bill No. 3659 (1973-1974 Reg. Sess.).) We think the legitimate ends to be served by such measures can be more effectively accomplished by other means and we decline the invitation to fashion such an instruction.

We deem it appropriate instead to reaffirm and reinforce the existing instructions as to the credibility of witnesses which must presently be given—at least in part (see Pen. Code, § 1127)—*sua sponte* by the trial court in every criminal case. Thus the substance of the instruction set forth as CALJIC No. 2.20[7] should henceforth always be given, and while

focusses on the character of the crime rather than the nature of the evidence. (Cf. *post*, fn. 9.)

Nothing we say in this opinion should be construed as precluding the development of new instructions designed to enhance juries' consideration of particular types of evidence, such as the testimony of a child of tender years.

[7]CALJIC No. 2.20 is entitled "Credibility of Witness" and provides:

"Every person who testifies under oath is a witness. You are the sole and exclusive

those paragraphs thereof inapplicable under the evidence may be omitted, the paragraphs alerting the jury to the bearing on the credibility of a witness of the "existence or nonexistence of a bias, interest, or other motive" and the attitude of the witness "toward the action in which he testifies or toward the giving of testimony," should be given in any case in which the victim of the alleged offense has testified for the prosecution, regardless of whether specific evidence of any motive or disposition to misstate facts on the part of the complaining witness has been adduced by the defendant.

We are also of the opinion that an instruction derived from CALJIC No. 2.22[8] will greatly aid triers of fact in arriving at proper verdicts, and so should be given henceforth in every criminal case in which no corroborating evidence is required. CALJIC No. 2.22 currently consists of a single paragraph within which there is a bracketed sentence stating: "Testimony which you believe given by one witness is sufficient for the proof of any fact." This single sentence has heretofore been given as part of CALJIC No. 2.22 except in cases in which corroboration was required. We believe this sentence should be removed altogether from CALJIC No. 2.22, which instruction as so modified should henceforth be given in

judges of the credibility of the witnesses who have testified in this case.
"In determining the credibility of a witness you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony, including but not limited to the following:
"His demeanor while testifying and the manner in which he testifies;
"The character of his testimony;
"The extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies;
"The extent of his opportunity to perceive any matter about which he testifies;
"His character for honesty or veracity or their opposites;
"The existence or nonexistence of a bias, interest, or other motive;
"A statement previously made by him that is consistent with his testimony;
"A statement made by him that is inconsistent with any part of his testimony;
"The existence or nonexistence of any fact testified to by him;
"His attitude toward the action in which he testifies or toward the giving of testimony;
"His admission of untruthfulness;
"His prior conviction of a felony."

[8]CALJIC No. 2.22 is entitled "Weighing Conflicting Testimony" and provides:
"You are not bound to decide in conformity with the testimony of a number of witnesses, which does not produce conviction in your mind, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force. [Testimony which you believe given by one witness is sufficient for the proof of any fact.] This does not mean that you are at liberty to disregard the testimony of the greater number of witnesses merely from caprice or prejudice, or from a desire to favor one side as against the other. It does mean that you are not to decide an issue by the simple process of counting the number of witnesses who have testified on the opposing sides. It means that the final test is not in the relative number of witnesses, but in the relative convincing force of the evidence." (Brackets in original.)

every criminal case in which conflicting testimony has been presented. A new instruction incorporating the deleted sentence should be given in every criminal case in which no corroborating evidence is required and should read substantially as follows: "Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact to be proved solely by the testimony of such a single witness, you should carefully review all of the testimony upon which proof of such fact depends."

These instructions in most instances should properly focus the jury's attention on the cruciality of the testimony of a particular witness, but they are not the only procedural resources available for this purpose to the defendant and the trial court. For his part, the defendant is entitled upon request to an instruction "relating particular facts to any legal issue." (*People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].) Such a requested instruction may, in appropriate circumstances, relate the reasonable doubt standard for proof of guilt to particular elements of the crime charged (*id.*) or may "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi (*People* v. *Roberts* (1967) 256 Cal.App.2d 488, 492-494 [64 Cal.Rptr. 70]; *People* v. *Gomez* (1972) 24 Cal.App.3d 486, 490 [100 Cal.Rptr. 896]).

Finally, the trial court itself possesses residual discretion to counter by comment[9] the danger that a jury exposed to a welter of conflicting evidence may drift to a verdict without proper appreciation that such a verdict necessarily entails rejection of some evidence in favor of other evidence. It is principally the duty of counsel to provide the jury with routes to reach the various verdicts consistent with the evidence as viewed favorably to the respective parties, but when confusion still reigns after closing argument the trial court should touch upon assertions of fact as well as the governing propositions of law. A trial court is constitutionally empowered to make, in its discretion, "such comment on the evidence and testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10.)

---

[9]A trial court's discretion to comment on the particular facts of the case before it is not to be construed as permitting a trial court to resurrect the language of CALJIC No. 10.22. If a trial court feels obliged to counsel the jury to view the testimony of a complaining witness with caution, it should not cast this cautionary admonition in terms of the nature of the crime charged but rather should articulate the need for caution in terms of the evidence adduced at trial, i.e., inconsistent statements, lack of character for veracity, bias, etc. (cf. Evid. Code, § 780; CALJIC No. 2.20, *ante,* fn. 7), which if believed by the jury may have a bearing on the credibility of the complaining witness.

This power is to be exercised with great care, lest the province of the jury as trier of fact be invaded. (*People* v. *Friend* (1958) 50 Cal.2d 570, 577-578 [327 P.2d 97].) But it is the fitting instrument to be employed when a jury needs to be made aware, in the particular circumstances of a given case, that it must give credence to certain evidence as the cornerstone of a certain verdict. (See *People* v. *Brock* (1967) 66 Cal.2d 645, 650 [58 Cal.Rptr. 321, 426 P.2d 889].) This is particularly true when the only witnesses to an alleged offense are the complaining witness and the defendant and there is little or no corroborating evidence to support the truth of the charge. We recognize that trial courts have grown suitably wary of commenting upon the evidence in deference to defendants' rights to jury trials. Trial courts should realize, however, that this constraint should not inhibit appropriate comments solicited by defendants themselves or which otherwise appear necessary to protect *defendants'* interests.

The judgment is affirmed.

McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.