[No. D016034. Fourth Dist., Div. One. Mar. 5, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
EUGENE GAILORD et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1 this opinion is certified for publication with the exception of part I.

1644

COUNSEL

Judith L. Fanshaw and John Leis Staley, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont, James E. Atkins and Stephen E. Carr, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, J.**—In this case, we conclude Eugene Gailord and Charles Lamale Allen are entitled to reversal of their enhancement findings based on

Allen being armed with and using a "firearm" (Pen. Code,[2] §§ 12022, subd. (a)(1), 12022.5, subd. (a)) as defined under section 12001, subdivision (b), during the commission of a commercial burglary (§ 459) and three robberies (§ 211). At the time Gailord and Allen committed the underlying crimes, the legal definition of "firearm" had recently been changed to include only devices "designed to be used as a weapon, from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion." (§ 12001, subd. (b); Stats. 1990, ch. 9, § 1.5.) Because the jury was not instructed under the correct legal definition of "firearm" as of the time of the underlying offenses, the true firearm findings against Gailord and Allen must be reversed.

Accordingly, we affirm Allen's unchallenged burglary and robbery convictions and reverse the true findings of his firearm enhancements.

As for Gailord, who challenges the sufficiency of the evidence of one of the three robberies and asserts instructional error regarding his aiding and abetting that third robbery, we find no error. We therefore similarly affirm Gailord's convictions and reverse the true findings of his firearm enhancements. We explain.

### Factual and Procedural Background

Gailord and Allen were charged with various crimes stemming from the daytime burglary of Fashion Concepts, a woman's boutique in Chula Vista, California, on July 18, 1991, about noon. Each admitted to having committed certain crimes at the store on that date. Gailord confessed during an arrest interview to entering the boutique "to boost some [clothing] with the use of a large plastic trash bag." Allen made a judicial confession during his testimony at trial he entered the shop the same day and time as Gailord to commit a robbery and robbed three separate women within the store.

The only matters for the jury to determine at trial in light of these admissions of guilt were whether Gailord had aided and abetted Allen in the three robberies within the store and whether Allen was in possession of and used a "firearm" when he committed the crimes. The jury found both matters against Allen and Gailord. On appeal, in addition to sentencing issues, Allen, joined by Gailord, challenges the sufficiency of the evidence and jury instructions concerning the firearm allegations. Gailord challenges the sufficiency of the evidence for one of the three robberies inside the store and a related instructional error. We thus set out the facts pertinent to these specific challenges and summarize the others for background of our discussion.

---

[2]All statutory references are to the Penal Code unless otherwise specified.

The owner of the boutique, Josefa Sanchez, and her daughter, Sonia Sanchez, each testified at trial to the events which took place on July 18, 1991. Their testimony painted the following scene. As they were working in the store around noontime, a Black man, later identified as Gailord, walked into the store, asking for some rayon clothing. While he was going through some racks and checking prices, another Black man, later identified as Allen, walked past the store's front door, looked in, and walked past again. Allen then walked into the store and spoke with Gailord before "he threw himself on" Josefa, holding a pistol to her head and telling Sonia to hang up the telephone and to give him all the money from the business.

After Sonia gave him about $60, Allen said he wanted more and directed both women to the office in back of the store, where Sonia gave him about $100 from Josefa's purse and a couple of dollars from her own. Allen made both women throw themselves, and their purses, on the floor and directed Sonia to turn the lights out. He told Josefa he would kill them if they did not cooperate. Allen then closed the door and the women heard another woman scream. Shortly, the door opened and the other woman, identified later as Bertha Ramirez, was dragged, pushed and kicked into the room and thrown to the floor by Allen. Allen also threatened to shoot her.

Neither Sonia nor Josefa knew when Gailord left the store. They only knew he was the one who brought out a big trash bag at about the same time Allen pulled out the gun and asked for their money. Gailord began putting clothes in the bag as they were forced by Allen to go to the back room.

On cross-examination, Sonia was unclear whether Allen was with her and her mother behind the closed door when Ramirez screamed or whether he had closed the door and reopened it to shove Ramirez in the back room.

Both Sonia and Josefa identified Gailord and Allen at curbside lineups on the day of the crimes and at trial as the men who entered the store July 18, 1991, and took clothes and money. They identified Gailord as the one who had the bag for the clothes and Allen as the one with the gun. When shown two exhibits concerning the gun, Sonia said the gun was without exhibit No. 14, the barrel, that only the receiver, marked exhibit No. 1, was used by Allen.

Through an interpreter, Bertha Ramirez testified she saw no one when she entered Fashion Concepts around noontime on July 18, 1991. Nor had she seen anyone in or leaving the store while walking to it from her car parked about 15 feet in front of the store. As she began looking at clothing on the store racks, a man put a machine gun to her chest and she asked him,

"What's happening?" Ramirez, who does not speak or understand much English, said Allen pushed her as she tried to leave the store. He then hit and kicked her as he dragged her inside the office and threw her down on the floor.

Ramirez said Allen took her purse with $3,000 to $4,000 cash as he was pushing and dragging her toward the back room. After Sonia translated Allen's threat to shoot Ramirez if she did not quiet down, Allen left. After a few minutes, Ramirez opened the back room door and left to find her purse.

Ramirez said she only saw Allen at the store that day and identified him during a curbside lineup after two suspects were caught, at the preliminary hearing and at trial.

When shown exhibit No. 1, the receiver of the gun, Ramirez said the gun was bigger; it also included the part identified as exhibit No. 14. Asked to demonstrate how the gun looked, Ramirez held "the gun with the second part, court's exhibit number fourteen, as if it had been halfway into the gun—in other words, as if it was a little longer, but not all the way in."

A man who lived across the street from the store testified that on July 18, 1991, between 11:30 a.m. and noon, he saw from his apartment two men in jackets talking before crossing the street to enter the boutique. His suspicions aroused by the jackets worn by the men in the heat, he came out to the sidewalk and saw one of the men coming out of the store with a black trash bag and then saw the other man running out of the store with his arms across his chest.

At trial the neighbor said he remembered telling police investigating the crimes a woman went into the store after the two men had gone in, but he did not remember anything at the time of trial about the time sequence concerning the woman entering the store in relationship to the men.

Further prosecution evidence tied Allen and Gailord to the crimes that afternoon. Several witnesses testified about seeing Allen and finding evidence connecting him to the crimes in a nearby backyard about one and a half blocks from the store. Police agents testified about Gailord's fingerprints being found on Allen's car, about the bag of clothes taken from the store by Gailord, about the exhibit No. 14 rifle barrel together with a magazine of bullets being found in the trunk of Allen's car, and about Gailord being found in some bushes near money, a brown wallet taken from Ramirez, and the receiver of the gun identified as exhibit No. 1.

Chula Vista Police Detective John M. Heggestuen testified that after full advisement of his rights, Gailord admitted taking the clothes in the large

trash bag found in Allen's car, but denied any other crime or possession of a gun. Gailord told Heggestuen that while he was taking clothes off the rack and putting them in the bag, he heard a woman scream and left the store.

Chula Vista Police Officer Pablo H. Godina testified he conducted the curbside lineups that afternoon and that Ramirez identified Gailord as the other suspect who did not have the gun.

In defense, Allen testified on his own behalf and called an expert on guns[3] and a family friend as witnesses. Allen confessed to committing the crimes at the store, but claimed he never threatened anyone. Allen also denied using a gun, saying he only used the "receiver" because he "knew it wasn't capable of harming anyone."

On cross-examination, Allen said he had driven to the store with a friend and had taken the receiver out of the trunk of the car and put it in his jacket before entering the store. He refused to say who the friend was, and, when pressed, said his name was "Rock." Allen said he could not positively identify Gailord as the person with him on July 18, 1991. Allen said he could not recall much about that day because he was "high" on some form of cocaine.

Lance Thomas Martini, an expert on guns, testified the receiver possessed and used by Allen was the part of a gun with the serial number permanently attached for legal registration as a "firearm." Martin stated that although the receiver part was not normally capable of discharging a cartridge, it was operable in rare situations. On cross-examination, he stated the exhibit No. 1 receiver in this case was a "firearm" by legal definition for purposes of registration.

During Martin's testimony, the court instructed the jury under a portion of CALJIC No. 17.19 (Personal Use of Firearm) that defined the word "firearm" as including "any device designed to be used as a weapon from which a projectile may be expelled by the force of an explosion or other form of combustion." The court also told the jury "[t]he firearm need not be operable."

The family friend called to testify in defense stated she had known Allen for three and a half years and knew him as being an honest and trustworthy person.

---

[3]Allen called his gun expert to testify after an Evidence Code section 402 hearing and the court admonished him the expert's testimony at that hearing revealed the expert would say the "receiver" was a "firearm," thereby supporting the People's position on the issue of whether Allen was in possession of and used a gun.

At the end of the defense case, the parties entered into three stipulations which were read to the jury. These provided that $32 was found on Gailord at the time of his arrest, that papers with Allen's name were found in the trunk of his car, and that $3,000 and Ramirez's identification card were found in the wallet about 15 to 25 feet away from where Gailord was found.

Before closing arguments, the court instructed the jury on the law in the case, including reinstructing about the definition of a "firearm" and aiding and abetting.

In closing, Allen's attorney argued the so-called gun in exhibit No. 1 was only a receiver and emphasized that without exhibit Nos. 14 (the barrel) and 24 (the magazine), the receiver did not fit the definition of a "firearm" as it could not expel a projectile hurting anyone. With the court's permission, he passed the exhibits to the jurors for their inspection.

Gailord's attorney during closing argument stressed the aiding and abetting instructions and explained Gailord would only be accountable for the "natural and probable consequences of the burglary" of the store, which he fully admitted.

After commencing deliberations, the jurors sent the court a note asking, "What is a natural and probable consequence? Need further definition." In response, the court told the jurors "it would be improper for [it] to define [a natural and probable consequence] any further than it is in [the] instruction" and asked the jurors "to use [their] own common sense as to the meaning of this phrase." This answer was satisfactory with all counsel.

The jury returned verdicts finding Allen and Gailord each guilty of burglary and three robberies. The jury also found true the allegations Gailord and Allen were armed with a firearm during the commission of all crimes and that Allen used a firearm during the robberies.

On November 19, 1991, Allen and Gailord were separately sentenced to prison for totals of nine and six years respectively. Each has timely appealed.

DISCUSSION

We first address Gailord's sufficiency of the evidence and related instructional error claims before turning to the firearm enhancement issue on which we reverse.

# I

*Gaylord's Sufficiency of Evidence Challenge\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# II

*The Enhancement Challenges*

Allen, joined by Gailord, contends the true findings on all the firearm enhancements must be reversed because there was insufficient evidence Allen possessed and used a firearm within the meaning of sections 12022, subdivision (a)(1) and 12022.5, subdivision (a), as defined in section 12001, subdivision (b). They argue the uncontroverted evidence demonstrates Allen only possessed the receiver portion of a gun, which is not designed to shoot by itself and which does not fit the statutory definition of a "firearm." In support of their latter argument, they assert the amendment of section 12001, subdivisions (b) and (c) in 1990 reflects the Legislature's intent not to include the "receiver" of a gun within the statutory definition of a "firearm."

■ By way of supplemental brief, Allen and Gailord also assert instructional error concerning the firearm enhancements. They specifically argue the jury instructions regarding the definition of a firearm given in this case were inaccurate or incomplete as they did not direct the jury to determine whether Allen possessed only the receiver or both the receiver and the barrel assembly.

We agree with Allen and Gailord the jury instructions read to the jurors in this case did not adequately apprise the jury of the necessity of determining whether Allen possessed the barrel assembly in addition to the receiver so as to comply with the recent legislative changes in the definition of "firearm." Without such instructions, the jury could not have properly determined on this record whether Allen possessed and used a "firearm" for purposes of the section 12022, subdivision (a)(1) and 12022.5, subdivision (a) enhancements.

The evidence in this case was conflicting as to whether Allen possessed and used only the exhibit No. 1 receiver or the receiver together with the exhibit No. 14 barrel. Since it is the exclusive province of the jury to determine conflicting factual matters (Evid. Code, § 312), and its determination may be made upon the testimony of a single witness (see *People* v.

---

*See footnote, *ante*, page 1643.

*Rincon-Pineda* (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 588 P.2d 247, 92 A.L.R.3d 845]), it is crucial a jury be properly instructed on all the elements of a crime or enhancement.

Here, based on Ramirez's testimony alone, the jury could have concluded Allen was armed with and used a weapon consisting of the receiver and barrel assembly, thereby making it a fully functional semiautomatic .22-caliber rifle. Further, the jury may have relied on the expert's statement the receiver was legally a "firearm" for purposes of registration to also find the receiver a "firearm" for enhancement purposes. Thus, it was imperative the jury be instructed on the applicable statutory definition for "firearm" enhancements.

The enhancement provisions for arming and using a firearm during the commission of a crime at issue here (§§ 12022, subd. (a)(1), 12022.5, subd. (a)) are contained within title 2 of the Dangerous Weapons Control Act (the Act). Section 12001 of that title defines what constitutes a "firearm" for purposes of weapons control under the Act. In 1990, section 12001 was amended to provide a new subdivision (b) defining "firearm" for title 2. This subdivision states: "As used in this title, 'firearm' means any device, designed to be used as a weapon, from which is expelled *through a barrel* a projectile by the force of any explosion or other form of combustion." (Italics added.) Subdivision (c) of section 12001 expands the definition of "firearm" stated in subdivision (b) to include the receiver of a weapon. Subdivision (c) of section 12001 specifically provides: "As used in Sections 12021, 12021.1, 12070, 12071, 12072, and 12073 of this code, and Sections 8100 and 8103 of the Welfare and Institutions Code, the term 'firearm' includes the frame or *receiver* of any such weapon." (Italics added.)

Subdivision (c) of section 12001 does not include either sections 12022, subdivision (a)(1) or 12002.5, subdivision (a) within the list of sections to which the expanded definition of "firearm" applies.

Before the 1990 amendment adding a new subdivision (b) and (c) to section 12001, "firearm" had generally been defined as "any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion. . . ." (§ 12001; Stats. 1967, ch. 1361, p. 3201, § 1; see also CALJIC Nos. 17.15, 17.19.) Because the Legislature in 1990 specifically defined a "firearm" as a weapon from which a projectile is expelled through a barrel, rather than as one from which a projectile is expelled, regardless of possessing a barrel, we conclude it did not intend the receiver of a weapon to fall within the more limited general definition of a "firearm" under section 12001, subdivision (b).

The CALJIC instructions read to the jury in this case on the firearm enhancements (CALJIC Nos. 17.15 and 17.19) tracked the pre-1990 amendment language defining "firearm." Because the jury was instructed under the earlier, more expansive definition of "firearm," it did not have to determine whether Allen possessed both the receiver and the barrel to fall under the current "firearm" definition for enhancement purposes. The instructions, as applied to the facts of this case, were erroneous because they failed to properly follow the statute. Therefore, the true jury findings for the firearm allegations must be set aside.

Although there was arguably sufficient evidence from which the jury could have found Allen possessed and used a "firearm" even under the current definition of that term, we will not second-guess what the jury would have done if it had been properly instructed in light of the closeness of the testimony in this case. While Ramirez testified Allen possessed both the receiver and the barrel when he robbed her in the store, Sonia, Josefa and Allen testified only the receiver was used in the robberies. The credibility of those witnesses is for a jury, not this court. Accordingly, we must reverse the true firearm enhancement findings.

In light of this determination, we do not address Gailord's or Allen's other contentions.

### DISPOSITION

The true findings on all firearm enhancements are reversed. In all other respects, the judgment is affirmed.

Kremer, P. J., and Work, J., concurred.