Filed 1/8/21  P. v. Thibodeaux CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAKYM THIBODEAUX,<br><br>    Defendant and Appellant. | B299468<br><br>(Los Angeles County<br>Super. Ct. No. MA070962) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann Mitchell, Judge.  Affirmed.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Susan Sullivan Pithey, Assistant Attorneys General, Colleen M. Tiedemann and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Rakym Yanell Thibodeaux (defendant) appeals from the judgment entered upon his conviction of second degree murder. Defendant contends that there was insufficient evidence to support a finding that he acted with implied malice and instructional error. He contends that jury instruction CALCRIM No. 520 was incomplete and should have been modified sua sponte, by the trial court. He also contends that the trial court erred in failing to give a sua sponte "*Dewberry* instruction."[1] Defendant additionally asks that we review the sealed transcript of the trial court's in camera review of materials sought in discovery. We have reviewed the sealed transcript and find no abuse of discretion. We further find no merit to defendant's other contentions and affirm the judgment.

## BACKGROUND

Defendant was charged with the murder of Kahlil Williams[2] in violation of Penal Code section 187, subdivision (a),[3] as well as firearm enhancements under section 12022.53, subdivisions (b), (c), and (d).[4] A jury found defendant guilty of

---

[1] See *People v. Dewberry* (1959) 51 Cal.2d 548 (*Dewberry*).

[2] As Kahlil Williams and his sister Britney Williams were mentioned throughout trial, we will refer to them both by their first names to avoid confusion.

[3] All further statutory references are to the Penal Code, unless otherwise indicated.

[4] The prosecutor dismissed the section 12022.53, subdivisions (b) and (c), allegation sometime prior to the verdict.

second degree murder and found true the section 12022.53, subdivision (d), allegation that defendant personally and intentionally discharged a firearm which caused great bodily injury and death to the victim.  On June 24, 2019, the trial court denied defendant's motion for new trial and sentenced him to 15 years to life in prison, plus 20 years pursuant to section 12022.53, subdivision (c), in place of the stricken enhancement under section 12022.53, subdivision (d).  Defendant was awarded 808 actual days of custody credit, and ordered to pay fines, fees, and victim restitution.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**
### *Trayshawn Davis (Davis)*
Davis was present and clearly saw defendant shoot Davis's best friend Kahlil on April 7, 2017, when the two friends were 16 or 17 years old.  Davis had known Kahlil for three years and had been staying with him for two days in Kahlil's family home in Lancaster.  Davis also knew Kahlil's sister Britney and two of his brothers, including Terrell Scott (Scott) who was also present that night with defendant.

Davis testified that he and Kahlil had been "hanging out" in the garage, each sitting on one of two ice chests, when a few minutes before 11:00 p.m., defendant entered the garage with a "crazy look in his eye."  Defendant was holding a gun in his right hand and waving it back and forth, pointing it at Davis, then at Kahlil and back several times as he stood about five to seven feet away from them.  Though it seemed longer, Davis thought that defendant waved the gun for about three minutes.  Davis had

3

never seen a real gun before, and he was scared. Davis did not see a phone in defendant's hand, nor did he see defendant texting or making a call while he was in the garage. As Kahlil said to defendant, "Don't wave a gun unless you're going to use it," defendant focused on Kahlil, pointed the gun at him and shot him. Defendant then dropped the gun and said, "I messed up," and, "Damn. I'm going to jail for life." Davis, in shock, said, "Oh, you killed the homie," and ran outside and back again.

Initially Davis thought it had been an accident, but he changed his mind when he realized he had seen defendant point the gun at Kahlil and pull the trigger. Kahlil never grabbed for the gun, did not try to pull or wrestle it away from defendant, and at no point did he even touch the gun. It appeared to Davis that defendant shot on purpose, not accidentally.

When the police arrived, everyone was taken to the station and fingerprinted. The next morning, Davis was interviewed by Detectives Carillo and Torres at the Lancaster Sheriff's station. Davis told the detectives that he did not think that defendant killed Kahlil on purpose, and thought defendant was playing around when he pointed the gun. He thought it was an accident because defendant seemed to feel "really bad."

A recording of Davis's interview with the detectives was played for the jury during his cross-examination. Davis told the officers that it was Kahlil's older brother, whose name he did not know, who shot him. Davis had first seen this person just two days earlier. Davis told detectives that the car parked in front of the garage belonged to Kahlil's other brother Terrell, who was not the one who shot Kahlil. Davis said the one who shot Kahlil was wearing a red hat. Describing what happened, Davis said: "His brother comes pointing it (INAUDIBLE). Pointing it at him

4

and he says don't point that at me unless you're going to use it and it went off.  It didn't seem like it was on purpose because it looked like -- I don't even know how to describe it.  It seemed like (INAUDIBLE) pulled (INAUDIBLE)." Asked what the shooter did, Davis replied, "Shot him.  He just came up to him and pointed the gun and shot him," and, "That was, that is exactly how the story was.  And he sat there (INAUDIBLE) they were playing around or (INAUDIBLE)."  Davis explained that defendant, whom other witnesses testified was like an older brother to Khalil said nothing before firing, and, "That's why I believe it was an accident, but then it was like, but come on now. He shouldn't never have pointed that (INAUDIBLE). They tell you not to play with guns for a reason."

### Terrell Scott

Scott testified that he lived in the Lancaster family home with his grandmother Lina West, his sister Britney, brother Kahlil, his aunt Cassandra, and his girlfriend Vertasha Banks.  Scott had been friends with defendant for about two or three years.  Defendant often visited and was considered a friend of the family.  They were close, had no issues, and defendant called Kahlil "little brother."

On April 7, 2017, Scott and defendant arrived in the early evening.  Scott was in the kitchen until sometime between 10:30 and 11:00 p.m., and then went out to his car to smoke.  He left by passing through the garage, where he saw Kahlil sitting on an ice chest.  Davis was standing toward the back of the garage near the washing machine.  Since it was the first time he had seen Kahlil all day, he greeted him with a handshake, said, "I love you, bro," before going to his car.  From the car Scott could see

5

defendant and Kahlil through the partially open garage door. He saw defendant walk up to Kahlil and give him a nudge as though to ask, "What's up, bro." Scott could see defendant only from the torso down, and he did not see anything in his right hand.

Scott was looking down when he heard a gunshot. He looked up and saw his brother fall to the ground. He had seen no fighting or punching, and had heard no yelling. He did not see a gun in defendant's hand or on the ground. Defendant walked toward Scott and said, "Bro, I'm gone. I just killed my baby brother," as Davis ran back and forth, screaming, "He shot K-Dubb. He shot K-Dubb."[5] Defendant appeared to be in shock, and although he appeared to be apologetic, he did not say he did not mean to do it. Defendant then walked to the middle of the street, dropped to his knees, and put his hands on his head.

Scott was arrested as a suspect. He heard later that defendant had accused him. Scott knew that defendant carried a gun, and knew that he got it in 2016, after being burglarized. However, he did not know defendant was carrying a gun that night.

### *Vertasha Banks (Banks)*
Banks testified that earlier that night, while her three-year-old son was playing with defendant and hit something in defendant's pocket, Banks looked and saw the weapon. She then made eye contact with defendant, and gave him "a look." Defendant and Scott then walked out to the garage together. A short while later she heard a gunshot. She went outside, saw a body on the ground and saw defendant running toward the

---

[5] Kahlil's nickname was K-Dubb.

street, looking scared.  He fell to the ground with his hands on his head.  Davis was screaming, "Oh, my god.  Oh, my god." Defendant then approached the garage with a gun in his hand. Banks told him to back up, and he slowly knelt down, put the gun on the ground, and then proceeded to walk toward her. Defendant said, "I killed my brother," and, "I'm sorry.  I'm so sorry."  Banks called the police, who arrived within minutes.

Banks spoke to two detectives at the Lancaster Sheriff's station around 9:00 a.m. the next day.  When her recorded statements were read to her, she agreed that she must have told them that defendant said, "I didn't mean to do it.  He just grabbed it out of my hand, and it went off."  She also agreed that she must have told the detectives that she saw defendant's phone on the ground that night, although she did not recall doing so. She knew that defendant owned an iPhone and had a red hat.

### *Cassandra Robinson (Robinson)*

Robinson testified that she had been in the garage with her nephew Kahlil and Davis that night, and within seconds of returning to the house, heard a gunshot.  She ran back to the garage, saw her nephew on the ground, and lay next to his body. Scott and defendant tried to drag her off, and Davis helped her up.  She saw the gun on the floor near the front of the garage, picked it up, and hid it in the mailbox.  When the police arrived, she told them where it was. Davis told her that Kahlil had killed himself, someone else said something about a robbery, and another person said something about messing around with her niece.  Robinson picked up the gun, knowing she should not, but she knew her nephew had not killed himself.

7

### *The investigation*

Detective Torres recovered the gun from the mailbox, and observed live rounds in the magazine, that the hammer was cocked and the safety was off.  He also recovered Kahlil's cell phone from under his body, and an expended bullet, and shell casing from the scene.  Both defendant's and Robinson's cell phones were recovered from the garage floor.

Deputy sheriffs at the scene had Scott under arrest as the suspect, because they were told that Kahlil had been shot by his brother.  After the detectives learned that defendant was Kahlil's "play brother," Scott was released.

Detectives Torres and Carillo, interviewed Banks the next morning.  Banks reported defendant's statement:  "I didn't mean to do it.  He just grabbed it out of my hand, and it went off."

A Sheriff's Department firearms analyst examined defendant's gun and found it functional, fired normally, and its safety features were functioning properly.  He explained that the gun had a thumb safety decocker, which if pushed downward, allowed the hammer, if cocked, to fall forward without firing.  Once the safety is released, the trigger would have to be pulled fully rearward with constant pressure in order to fire.  Once the gun was fired in double action, that is, cocked, it would thereafter fire in single action, which means by simply pulling the trigger all the way back without cocking the gun again.  The pressure required to pull trigger in double action was a little over ten pounds, and six pounds in single action.  Defendant's gun was test-fired, and it was determined that the recovered bullet and cartridge casing had been fired from it.

The autopsy revealed that Kahlil died of a single gunshot wound after the bullet entered the side of his nose, traveled

through his brain, and exited the back of his head.  There was unburned gunpowder stippling around the entry wound, which indicates that the gun was 18 inches or less from Kahlil's face when it was fired.

**Defense evidence**

### *Defendant on direct examination*

Defendant testified that he was seven or eight years older than Kahlil who he had known for about three years, and who he referred to as his little brother.  In 2016, defendant lived with Scott and Banks in an apartment which had been burglarized a few times.  The burglar was someone known as "Hollywood."  Defendant carried the gun for protection from Hollywood, who had made threats and lived in the same apartment building.  Defendant had the gun with him that night because earlier he had planned to retrieve mail and get something for Banks at the old apartment.

Defendant and Scott had spent most of the day together.  After Banks's son hit defendant's jeans pocket and felt the gun, defendant intended to put the gun in his backpack in the car.  That was about 10:35 or 10:40 p.m.

Defendant walked out through the door that leads into the garage, while texting on his phone.  He claimed that the light was not on in the garage, and the only person he saw there was Kahlil.  Defendant held his cell phone in his left hand as he texted.  The gun was in his right pocket.[6]  Kahlil was sitting on the ice chest and greeted him with, "What's up, big bro?"  They

---

[6]    Defendant presented his phone records showing that he began texting "Shavera" at 10:44 p.m.

9

shook hands and Kahlil said, "You have a burner [meaning gun] on you? Let me see it." Kahlil leaned forward, grabbing at the gun. Defendant grabbed back. Kahlil grabbed the handle of the gun, pulled it one way, while defendant pulled the handle the other way, upward toward his waist. Defendant then heard "a pop going off" and saw Kahlil fall. Defendant dropped the gun and his phone, and ran to the street. Defendant denied pointing the gun at Kahlil or at Davis, and claimed he did not know that Davis was in the garage. Defendant denied ever having had arguments or problems with Kahlil, and claimed that he did not say anything to Kahlil just before the shooting.

### *Defendant on cross-examination*
Defendant said he was not looking at Kahlil but was still looking at his phone when the gun fired. He sent his last text at about 11:00 p.m., and the gun fired around 11:00 or 11:02 p.m. Defendant denied having lied to the detectives who interviewed him, but admitted that he did not tell them that he had a gun or that it was his gun that shot Kahlil. He also admitted that the detectives asked what happened to Kahlil and he told them, "I didn't never said that. I didn't say that. I didn't see nobody shoot anybody. I never said that. And I put my hand on the Bible. I never said that I seen nothing. I said that I looked down. I seen his hoody and blood." Defendant testified that this was not a lie because everything happened so fast that he really did not know what had happened, and he was scared. Defendant explained that he said what he did to the detectives because he not see anything, as he was looking at his phone, not at Kahlil, even when Kahlil grabbed the gun, but he saw Kahlil in his peripheral vision.

10

Defendant was released after that interview. Defendant did not know whether Scott had been arrested, but since he heard him testify to that effect at trial, he guessed they arrested him. Defendant denied telling a deputy on the scene that Scott had done it. Defendant then admitted that he found out that Scott had been arrested when he returned to the house after his interview with the detectives. Defendant was taken back to the sheriff's station for a second interview soon thereafter. The detectives asked whether Scott had shot Kahlil. Defendant replied: "I never looked behind me. I never -- after I seen him down, I was just -- I don't know. I don't want to believe Scott did it. I can't say he did. I'm not going to say, 'yeah, he did.' I didn't see it."

Defendant heard Banks testify that he told her that Kahlil grabbed the gun out of his hand. But defendant said Kahlil did not grab it from his hand; he grabbed it from his pocket. Defendant explained that after the gun was out of his pocket, Kahlil grabbed the barrel of the gun, which was then facing him. Defendant explained the Kahlil never managed to pull the gun all the way out of defendant's pocket, because as it came out, defendant grabbed it.

Defendant testified that Davis was not truthful when he testified that defendant had waved the gun.

### *Firearms expert*
The defense also called David Kim, an independent forensic firearms examiner retired from the Sheriff's Department. He testified that he examined the gun recovered from the crime scene, and explained the difference between a double action and a single action function. He added that he had seen deputy

11

trainees fire double action semiautomatic pistols accidentally when he worked at the sheriff's academy.

Defense counsel asked Kim a hypothetical question based on the facts of this case about the amount of force needed to pull the trigger of the gun. Kim's opinion was that it would depend upon if the person had his hand on the trigger. If so, he could pull it without realizing it. He explained his past experiments for purposes of safety instruction, and found that when he allowed inexperienced trainees to grab a gun from a table, they usually did so with a finger on the trigger. Their finger just automatically went to the trigger.

## DISCUSSION

### I. Substantial evidence of second degree murder

Defendant contends that the evidence was insufficient to support a finding that defendant acted with implied malice.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331, citing *People v. Johnson* (1980) 26 Cal.3d 557, 578 and *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314.) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Kraft* (2000) 23

12

Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin, supra,* 18 Cal.4th at p. 331.)

Second degree murder is the unlawful killing of a human being with malice aforethought that is not willful, deliberate and premeditated. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 (*Nieto Benitez*); §§ 187, subd. (a), 189.) Malice may be express or implied. (§ 188; *Nieto Benitez,* at p. 102.) Malice is implied when the defendant kills as a result of a deliberate and intentional act that is naturally dangerous to human life, with conscious disregard for life. (*People v. Martinez* (2003) 31 Cal.4th 673, 684.) Implied malice requires that the defendant act with a subjective awareness of a high degree of risk to life. (*People v. People v. Watson* (1981) 30 Cal.3d 290, 296, 300.) It is not enough that a reasonable person would have been aware of the risk. (*Id.* at pp. 296-297.)

Malice may be, and usually must be, proved by circumstantial evidence. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945-946; *People v. James* (1998) 62 Cal.App.4th 244, 277.) A person who kills another "does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the

13

requisite intent to kill is, of course, a question for the trier of fact." (*People v. Lashley, supra,* at pp. 945-946.)

As respondent observes, "the testimony of a single witness is sufficient to uphold a judgment even if it is contradicted by other evidence, inconsistent or false as to other portions. [Citation.]" *People v. Leigh* (1985) 168 Cal.App.3d 217, 221; see *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885.)

Here, the evidence shows that defendant entered the garage, approached Kahlil and Davis holding a gun in his right hand. He waved it back and forth between the two youths while pointing the gun toward them for about three minutes. As soon as Kahlil told defendant not to wave a gun unless he intended to use it, defendant focused on Kahlil, pointed the gun at him within 18 inches of his face, and pulled the trigger. Davis saw defendant's finger pull the trigger, and it appeared purposeful, not accidental.

Respondent points out that there was substantial evidence that defendant harbored a conscious disregard for the danger to human life with his actions and thus demonstrated implied malice. "[B]randishing a loaded firearm at a person is an act dangerous to human life. [Citation.]" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1425.) Here, the evidence showed that defendant knew the gun was dangerous to human life. When Banks made eye contact with defendant and gave him "a look" after her child touched defendant's gun, he immediately got up and went to the garage. Once there, he pointed the gun at the two young men while waving it back and forth, before pulling the trigger. Defendant testified that he obtained the gun in 2016, and had owned the gun for at least six months. He did not claim

14

to be inexperienced with guns; nor did he claim that he thought the gun was unloaded or inoperable.

Defendant acknowledges that the jury apparently did not believe his testimony and rejected his defense.  Nevertheless, he suggests that Davis's testimony was "incredible, unreliable, and wholly unworthy of belief [and] contradicted not only by other witnesses and physical evidence, but by his own statements to police hours after the shooting."  Defendant invites this court to give more weight to evidence that defendant loved Kahlil, had not argued with him, and was playing around with the loaded weapon when it accidentally fired.

We do not reweigh the evidence or resolve conflicts in the evidence.  (*People v. Young, supra,* 34 Cal.4th at p. 1181.)  "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]"  (*People v. Maury, supra,* 30 Cal.4th at p. 403.)  "'"To warrant the rejection of the statements given by a witness who has been believed by a [jury], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions."'  [Citations.]"  (*People v. Maciel* (2013) 57 Cal.4th 482, 519.)  Furthermore, "a trier of fact is permitted to credit some portions of a witness's testimony, and not credit others."  (*People v. Williams* (1992) 4 Cal.4th 354, 364.)

Defendant has *opined* that Davis's testimony was improbable and "fraught with uncertainty," but he does not

15

contend or demonstrate that Davis's testimony was physically impossible or false without resorting to inferences or deductions. Moreover, Davis's testimony was corroborated by compelling evidence of defendant's consciousness of guilt. The jury may infer a consciousness of guilt from a defendant's admitted lies to police, as well as from the many inconsistencies in his testimony at the trial. (*People v. Dykes* (1961) 198 Cal.App.2d 75, 80.) When the detectives asked whether Scott had been the shooter, defendant replied: "I never looked behind me. I never -- after I seen him down, I was just -- I don't know. I don't want to believe Scott did it. I can't say he did. I'm not going to say, 'yeah, he did.' I didn't see it." When the detectives asked what happened to Kahlil, defendant told them, "I didn't see nobody shoot anybody. I never said that. And I put my hand on the Bible. I never said that I seen nothing. I said that I looked down. I seen his hoody and blood."

At trial, defendant claimed that this was not a lie because he was not looking at Kahlil when he shot him; he was looking at his phone and was texting. Defendant claimed not to know that Scott had been arrested until he heard Scott's testimony in court, but then testified that he found out about the arrest when he returned to Scott's house after defendant's first police interview. Defendant admitted at trial that he lied to detectives when he was asked how Kahlil died, saying he did not know.

Defendant told the detectives that Kahlil probably killed himself, but claimed at trial that it was not a lie, because he did not know who pulled the trigger, and that it was not misleading because he did not know who did what because it happened so fast. Defendant then admitted that he had said to the detectives, "To be honest, I'm going to say he probably shot himself because

16

he was the only one in the garage." When one of the detectives said, "It's impossible," defendant told him, "I'm telling you the honest God truth."

When manifestly and deliberately false statements are made about matters within the defendant's own knowledge and which relate materially to the issue of his guilt or innocence, "[s]uch falsifications cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances, and thus are admissions of guilt. [Citations.]" (*People v. Osslo* (1958) 50 Cal.2d 75, 93.)

Defendant contends that the prosecutor conceded in closing argument that defendant did not intend to kill Kahlil and that the killing was accidental.[7] The prosecutor said, "This is a second degree murder case. Okay. This has not been charged as first degree murder. It's not been charged as a willful, deliberate, premeditated murder. This is second degree murder . . . . This is an implied malice case. I'm not going to sit up here tell you that this is express malice case." The prosecutor then gave some examples of implied malice, and erroneously concluded that if there was an intent to kill, that would be express malice *and* first degree murder.

Second degree murder is the unlawful killing of a human being with either express or implied malice aforethought, but which is not willful, deliberate and premeditated. (*Nieto Benitez, supra,* 4 Cal.4th at p. 102; §§ 187, subd. (a), 188, 189.) A short time after the prosecutor's misstatement, when defense counsel

---

[7] Respondent does not concede here that the shooting was accidental.

17

objected to a different statement by the prosecutor, the court admonished the jury as follows: "Ladies and gentlemen, with respect to the law, I've given you the law as to the charge of murder, the lesser of involuntary manslaughter, and excusable justification or accident. You follow the law as I give it to you. This is the attorneys' argument and their interpretation of the law, but you follow the law I gave you in that packet." The court had earlier instructed the jury with CALCRIM No. 200, which, among other things, told the jury, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The court had also previously instructed the jury that if it found the defendant guilty of murder, it would be murder of the second degree. The court further instructed with CALCRIM 520, in relevant part as follows:

> "The defendant is charged with murder in violation of Penal Code section 187. To prove that the defendant is guilty of this crime, the People must prove that: 1. The defendant committed an act that caused the death of another person; 2. When the defendant acted, he had a state of mind called malice aforethought; AND 3. He killed without lawful excuse or justification. "There are two kinds of malice aforethought, express malice and implied malice. *Proof of either is sufficient to establish the state of mind required for murder. . . . .*" (Italics added.)

The court then defined express and implied malice. The court also instructed the jury with CALCRIM No. 510 that

18

"[d]efendant is not guilty of murder if he killed someone as a result of accident or misfortune," along with an explanation how to determine accident or misfortune. And the court instructed with CALCRIM Nos. 580 and 983, defining and explaining involuntary manslaughter.

"It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions. [Citation.]" (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) As the jurors rejected defendant's claim of accident and found defendant guilty of murder, we assume that the jury found either express or implied malice, and as we have discussed above, substantial evidence supported either finding.

## II. CALCRIM No. 520

Defendant contends that CALCRIM No. 520, which defines implied malice, fails to include that the defendant's conduct must have caused a "high probability of death, and thus giving the instruction was error. He argues that the error was a failure of the court's sua sponte duty to instruct the jury on the elements of the charged crime. Defendant nevertheless acknowledges that over more than three decades, several courts of appeal have rejected the basic claim he raises here. (See, e.g., *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1353-1354; *People v. Cleaves* (1991) 229 Cal.App.3d 367, 377-378; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 530-532.)

"[S]econd degree murder based on implied malice has been committed when a person does ""an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life""

19

. . . .' [Citations.]" (*People v. Watson, supra*, 30 Cal.3d at p. 300.) This the definition of implied malice contained in CALCRIM No. 520, read to the jury as follows:

> "The defendant acted with implied malice if: 1. He intentionally committed an act; 2. *The natural and probable consequences of the act were dangerous to human life*; 3. At the time he acted, he knew his act was dangerous to human life; AND 4. He deliberately acted with conscious disregard for human life. Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." (Italics added.)

In *Nieto Benitez*, our Supreme Court rejected a challenge to CALJIC No. 8.31, the predecessor to CALCRIM No. 520, which was made on the same ground that defendant posits here: that it "misstates the law because the instruction omits a requirement that defendant commit the act with a *high probability* that death will result." The court noted that a former version of CALJIC No. 8.31 included the "high probability" language, and that in *People v. Dellinger* (1989) 49 Cal.3d 1212, 1217, the court had expressly approved the revised version which omitted that language in favor of the "dangerous to life" language. (*Nieto Benitez, supra*, 4 Cal.4th at p. 111.) The court explained that the two expressions, "'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent [and] embody the same standard. [Citations.]" (*Id*. at p. 110.) It follows that the

20

language of CALCRIM No. 520 is a correct statement of law, with the result being that the trial court had no sua sponte obligation to modify the instruction or insert additional language. (See *People v. Lee* (2011) 51 Cal.4th 620, 638.)

Moreover, a trial court is not required to give instructions which are duplicative of standard jury instructions. (*People v. Earp* (1999) 20 Cal.4th 826.) Nevertheless, defendant contends that his trial counsel rendered ineffective assistance by failing to request the court do just that. It is the defendant's burden on appeal to demonstrate that trial counsel was inadequate and that prejudice resulted. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) Prejudice is shown by "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) Defendant has failed to meet the first prong of his burden, as counsel is not ineffective by failing to request unnecessary and duplicative instructions. (*People v. Lucero* (2000) 23 Cal.4th 692, 729.) Furthermore, it is unlikely that the trial court would have granted the request to give an unnecessary instruction, as CALCRIM No. 520 properly instructed the jury on this point.

As for prejudice, defendant argues that while horseplay with a gun or pointing it at a person can potentially result in great bodily injury, it does not necessarily have a high probability of death. Even if we accept that defendant was engaged in mere horseplay, it cannot be said that pointing a loaded firearm within 18 inches of a person's face, and then pulling the trigger, would not necessarily pose a high probability of death. We discern no reasonable probability that defendant would have received a different result had counsel requested the additional instruction.

21

Defendant's claim of ineffective assistance of counsel therefore fails.

## III.  Alleged *Dewberry* error

Defendant contends that the trial court erred in failing to give a "*Dewberry* instruction" sua sponte.  In *Dewberry, supra,* 51 Cal.2d 548, the defendant requested the trial court to instruct the jury that if it had a reasonable doubt whether defendant was guilty of murder or manslaughter, it could convict him only of manslaughter.  The California Supreme Court reversed the defendant's conviction because the trial court had rejected the request, even though it had given a similar instruction with regard to the degrees of murder.  (*Id.* at p. 554.)  The court explained that "when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense."  (*Id.* at p. 555; see § 1097.)

Some years later, the Supreme Court clarified *Dewberry*'s principle that "a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to all crimes with lesser degrees or related or included offenses.  [Citation.]"  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262 (*Musselwhite*).  The court held that a jury is adequately instructed as to this principle if the trial court gives "several generally applicable instructions governing its use of the reasonable doubt standard" which have the effect of requiring the jury to give the defendant the benefit of any reasonable doubt as to any lesser included or related offenses or lesser degrees.  (*Id.* at p. 1262-1263.)  So long as the trial court

22

gives such instructions, it is not required to give an instruction (such as CALJIC No. 8.71) which expressly applies the *Dewberry* principle. (*People v. Friend* (2009) 47 Cal.4th 1, 55; see *Musselwhite*, at p. 263.)

Our Supreme Court more recently held that an instruction which is nearly identical to CALJIC No. 2.02 provides an adequate benefit-of-the-doubt instruction under *Dewberry*. (*People v. Buenrostro* (2018) 6 Cal.5th 367, 430 (*Buenrostro*), citing *Musselwhite, supra*, 17 Cal.4th at pp. 1262-1263, and *People v. Friend, supra*, 47 Cal.4th at p. 55.) Here, the trial court instructed with CALCRIM No. 225, which corresponds to CALJIC No. 2.02 (see *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1171, fn. 12), as follows:

> "The People must prove not only that the defendant did the act charged, but also that he acted with a particular intent and mental state. The instruction for the crime and allegation explains the intent and mental state required. [¶] An intent and mental state may be proved by circumstantial evidence. [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent and mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and mental state. *If you can draw*

23

*two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and mental state and another reasonable conclusion supports a finding that the defendant did not, you must conclude that the required intent and mental state was not proved by the circumstantial evidence.* However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (Italics added.)

Like CALJIC No. 2.20, CALCRIM No. 225 conveyed the same requirements as a *Dewberry* instruction. (See *Buenrostro*, *supra*, 6 Cal.5th at p. 430.) It communicated the requirement of giving defendant the benefit of a reasonable doubt, and thus adequately "fulfilled the same function as the instruction proffered by the defendant in [*Dewberry*]." (*Musselwhite*, *supra*, 17 Cal.4th at p. 1263.)

Furthermore, the trial court gave "several generally applicable instructions governing its use of the reasonable doubt standard" as follows (*Musselwhite*, *supra*, 17 Cal.4th at p. 1262):

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt"; and, "Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is

24

entitled to an acquittal and you must find him not guilty."

(CALCRIM No. 220.)

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."

(CALCRIM No. 224.)

"The defendant may not be convicted of any crime based on his out-of-court statements alone"; and, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

(CALCRIM No. 359.)

"The defendant is not guilty of murder or manslaughter if he killed someone as a result of accident or misfortune"; and, "The People have the burden of proving beyond a reasonable doubt that the killing was not excused.  If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

(CALCRIM No. 510.)

"When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter"; and, "You may not find

the defendant guilty unless all of you agree that the People have proved that the defendant committed at least one of these alleged acts and you all agree that the same act or acts were proved."

(CALCRIM No. 580.)

"You will be given verdict forms for guilty and not guilty of second degree murder and involuntary manslaughter.  You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of involuntary manslaughter only if all of you have found the defendant not guilty of second degree murder.  To return a verdict of guilty or not guilty on a count, you must all agree on that decision.  Follow these directions before you give me any completed and signed final verdict form. Return the unused verdict forms to me, unsigned.

"1.  If all of you agree that the People have proved beyond a reasonable doubt that the defendant is guilty of second degree murder, complete and sign that verdict form.  Do not complete or sign any other verdict forms.

"2.  If all of you cannot agree whether the defendant is guilty of second degree murder, inform me that you cannot reach an agreement and do not complete or sign any verdict forms.

"3. If all of you agree that the defendant is not guilty of second degree murder but also agree that the defendant is guilty of involuntary manslaughter, complete and sign the form for not guilty of second degree murder and the form for guilty of involuntary manslaughter. Do not complete or sign any other verdict forms.

"4. If all of you agree that the defendant is not guilty of second degree murder but cannot agree whether the defendant is guilty of involuntary manslaughter, complete and sign the form for not guilty of second degree murder and inform me that you cannot reach further agreement. Do not complete or sign any other verdict forms.

"5. If all of you agree that the defendant is not guilty of second degree murder and not guilty of involuntary manslaughter, complete and sign the verdict forms for not guilty of both."

(CALCRIM No. 642.)

We conclude that the CALCRIM reasonable doubt instructions quoted above, adequately communicated to the jury their duty to give the defendant the benefit of any reasonable doubt as to the lesser included offense of manslaughter, as clarified in *Buenrostro*, *supra*, 6 Cal.5th at page 430, *People v. Friend*, *supra*, 47 Cal.4th at page 55, and *Musselwhite*, *supra*, 17 Cal.4th at pages 1262-1263. We thus reject defendant's claim of *Dewberry* error.

Furthermore, defendant has not demonstrated prejudice. The test of prejudice due to *Dewberry* error is determined under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether it is reasonably probable that, in the absence of the error, the result would have been different. (*Dewberry*, *supra*, 51 Cal.2d at p. 558; *People v. Crone* (1997) 54 Cal.App.4th 71, 78.) Under the *Watson* standard, it is defendant's burden to demonstrate the reasonable probability of a different result. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746.) However, despite having the burden to demonstrate prejudice, defendant does not set forth any facts to support that claim and instead merely concludes that the evidence of a conscious disregard of the risk was not overwhelming, citing authority for the proposition that evidence of guilt must be overwhelming to satisfy the *Watson* standard.

The evidence of implied malice was compelling. Defendant pointed a loaded firearm within 18 inches of Kahlil's face and then pulled the trigger. And if defendant was not already conscious of the danger to human life before going to Kahlil's home that night, it was made plain to him by Banks, when she gave him a look after her four-year-old son touched the gun in defendant's pocket. Defendant clearly got her message, as he immediately left the house to put the gun in his backpack in Scott's car. Instead, however, defendant stood before the two young men in the garage, waving and pointing the gun toward their faces.

Defendant's consciousness of the danger to human life was further demonstrated by his claim that he continued to look at his phone and to send text messages while allegedly trying to prevent Kahlil from grabbing the loaded gun and pulling it out of

28

defendant's pocket, seeing Kahlil only with his peripheral vision. Defendant claimed he was still looking at his phone when the gun fired, and had not said anything to Kahlil. Defendant's own account thus demonstrates reckless disregard for the danger, "'implying, actively, *a willingness to injure and disregard of the consequences to others,* and, passively, more than mere negligence, that is, *a conscious and intentional disregard of duty.*' [Citation.]" (*People v. Dellinger, supra*, 49 Cal.3d at p. 1220.)

In sum, whether the jury believed Davis's account or defendant's account, it is not reasonably probable that any rational juror would entertain a reasonable doubt that defendant harbored at least implied malice. Thus, we discern no reasonable probability that an instruction which expressly told the jurors to give defendant the benefit of any reasonable doubt between murder and manslaughter would have changed the result. Indeed, if the trial court had erred, we would find the error harmless under either the *Watson* standard or the standard for federal constitutional error under *Chapman v. California* (1967) 386 U.S. 18, 24.

## IV. In camera review

Defendant asked that we review the sealed transcript of the trial court's in camera review of materials sought in a pretrial *Pitchess* motion for discovery.[8] Defendant sought information

---

[8] See *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. A *Pitchess* motion "allow[s] criminal defendants to seek discovery from the court of potentially exculpatory information located in otherwise confidential peace officer personnel records. If a party bringing what is commonly called a *Pitchess* motion makes a threshold showing, the court must review the records in camera

from the personnel files of Los Angeles County Sheriff Deputy Arnold Camacho relating to allegations of racial bias, violations of constitutional rights, false arrests, dishonesty, lying, filing false or misleading police reports, and fabricating charges or evidence.

After hearing the argument of counsel, and based upon the information presented, including the prosecutors indication that he might call Deputy Camacho to testify, the trial court granted the motion only as to any complaints of dishonesty, including, but not limited to, false reports or fabrication of evidence. Although Deputy Camacho did not ultimately testify, respondent agrees that we should review the sealed transcript.

The 14 records produced in the trial court were not retained, but in the in camera hearing, the trial court examined and described each one, and stated reasons for its determination. We find the transcript sufficiently detailed to review the trial court's discretion, without having to order the production of the same documents in this court. (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1229.) We review the trial court's determination for an abuse of discretion. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220-1221.) Upon review of the sealed record of the in camera proceedings, we conclude the trial court properly exercised its discretion in determining that the documents produced complied with the scope of the *Pitchess* motion, and that only one of the documents should be disclosed to the defense.

---

and disclose to that party any information they contain that is material to the underlying case. (See Evid. Code, §§ 1043, 1045.)" (*People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 705.)

30

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

CHAVEZ


We concur:


_____, P. J.

LUI


_____, J.

HOFFSTADT