Filed 3/11/22  P. v. Cook CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY JOHN COOK<br><br>    Defendant and Appellant. | D077072<br><br><br><br>(Super. Ct. No. SCS297724) |


APPEAL from a judgment of the Superior Court of San Diego County, Carolyn M. Caietti, Judge.  Affirmed.

Kimberly J. Grove, appointed by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Julie L. Garland, Senior Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Timothy John Cook[1] of second degree murder (Pen. Code,[2] § 187, subd. (a)), and found true an allegation that in the commission of the murder he personally used a deadly and dangerous weapon, to wit a knife or sharp object (§ 12022, subd. (b)(1)). Timothy separately admitted he had suffered two serious felony convictions (§§ 667, subd. (a)(1), 668, and 1192.7, subd. (c)) and two prior strike convictions (§§ 667, subd. (b)-(i), 668, and 1170.12).

The court sentenced Timothy to 56 years to life in prison as follows: 15 years to life on the second degree murder charge, tripled to 45 years under the "Three Strikes" law, five years each for the two serious felony strikes, and a one-year enhancement for the weapon use allegation. The court struck a prior prison term enhancement.

Timothy contends: (1) insufficient evidence supported his murder conviction; (2) the trial court erroneously admitted certain blood spatter evidence; (3) the court erroneously excluded third-party culpability evidence; (4) the court erroneously instructed the jury on consciousness of guilt; and (5) there was cumulative error. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

In August 2017, Timothy moved into a house on McIntosh Street in Chula Vista, California. The victim, Omar Medina, moved into a detached room that was in the backyard of the house. Timothy's brother, Greg, helped Timothy financially around that time. Medina had previously lived with Greg, who occasionally hired him to work with him and Timothy. Greg

---

[1] We refer to Timothy and his brothers Greg and Steven Cook by their first names to avoid confusion, and intend no disrespect.

[2] Undesignated statutory references are to the Penal Code.

2

allowed Medina to sleep in a truck on his property. Greg knew Medina was awarded a lawsuit settlement of $84,251.74 in May 2017. In August 2017, Greg accompanied Medina to a credit union where Medina opened an account and deposited $80,000. Medina paid Greg $5,200 for a white Cadillac Greg had sold him, and as repayment of other debts.

On September 25, 2017, Greg complained to Medina that Medina did not help pay for an electrician who worked at Timothy's house, pointing out that Timothy did not have any money.

On September 29, 2017, Timothy and Greg communicated by text message about Medina. Timothy indicated that he was upset and felt disrespected by Medina, who he called a "dirty pig."

On September 30, 2017, at approximately 2:50 p.m., Medina drove his Cadillac to drop off some belongings at his mother's house, which was adjacent to the home of his sister, A.V. Medina told A.V. that he was "going to get kicked out of [his] so-called bachelor pad" at Timothy's house. Medina said he was going to drive around and return later.

Later that afternoon, Medina called his mother, A.R., on his cell phone and said to her, "Ma, listen to what this man is saying to me." Medina sounded upset, and A.R. understood Medina to be speaking about Timothy. This was the last time A.R. spoke with Medina. A.R. and A.V. unsuccessfully attempted to contact Medina in the ensuing days.

On October 1, 2017, A.R. drove by Timothy's residence twice and saw Medina's Cadillac, with items in it, parked in front of the residence. That evening, A.V. drove by Timothy's residence, but did not see Medina's car or anything associated with Medina. On October 2, 2017, she observed Medina's bed, weights, and lamp in the front yard. That day, the family reported to police that Medina was missing.

3

On October 7, 2017, Medina's family members and friends found his Cadillac near Timothy's house.

That same day, police officers conducted a welfare check at Timothy's residence. They used their body worn cameras, and the footage was played for the jury at trial. Timothy let the officers into the house and showed them Medina's living quarters, which had been completely cleaned out. The flooring was missing, parts of the room were wet, and some of the drywall was removed. A bedroom window was broken out and glass was lying on the ground outside. There were no signs of demolition or construction in the kitchen, whose sink was intact.

On the morning of October 12, 2017, someone spotted a 55-gallon white drum floating in the San Diego Bay between the Coronado Cays and the J Street Marina in Chula Vista. The drum appeared to have been tethered to the sea floor by a cable wire that looped through three cinder blocks. The Harbor Police saw human hair protruding from a hole in the drum. Also, a tan-colored fluid that seeped out of the hole emitted a rancid smell. The drum contained human remains, a brown blanket, a tan-colored standard sized pillowcase, and two small towels.

On October 13, 2017, a medical examiner performed an autopsy on the male who was later identified as Medina. The decomposition of Medina's body was consistent with him being killed on September 30, 2017, and placed in a drum, which was submerged in water. Medina had a total of 66 stab wounds—nine to his head and neck, 40 to his torso, and 17 to his arms. The medical examiner testified some of the stab wounds to the torso were life-threatening; a number of them penetrated into Medina's chest, there was a penetrating stab wound of his heart, at least five stab wounds into his left

4

lung, and two stab wounds into his left diaphragm. The cause of death was multiple stab wounds and the manner of death was homicide.

Law enforcement obtained video surveillance footage from the area where Medina's car was found. It showed that at 4:04 p.m. on October 1, 2017, a vehicle similar to Medina's approached a Circle K from McIntosh Street. At 4:08 p.m., someone wearing light-colored clothing walked through the Circle K parking lot. At 4:55 p.m., video surveillance from Timothy's credit union showed someone who matched the person from the Circle K footage withdraw money from an ATM from Timothy's account.

Law enforcement officers obtained additional video surveillance footage from the Otay Landfill showing that on October 10, 2017, an F-150 truck that went to the landfill had a large area rug that covered some items in the bed of the truck. The rug matched one seen in a video from Timothy's house.

On October 11, 2017, at 1:21 p.m., video surveillance captured the F-150 truck, with a white object in the truck's bed, pull a Bass Tracker boat on a trailer. Another video showed Timothy exit the driver's side of the truck and codefendant Derrick Spurgeon exit the passenger side. Timothy purchased a one-gallon water bottle. He wore a maroon shirt, khaki shorts, and a green baseball hat. The men pumped gas into the boat and truck. At 3:54 p.m., video surveillance from the J Street Marina showed the truck reversing onto the boat ramp. Timothy and Spurgeon exited the truck. Timothy slowly reversed the truck as Spurgeon maneuvered the boat off an attached trailer and into the water. A large white cylindrical object was visible in the boat as Spurgeon drove into the marina. At 4:02 p.m., the boat traveled into the open water of the bay. At 4:48 p.m., the boat returned to the marina, but the white object was no longer visible inside the boat. Spurgeon maneuvered the boat back onto the trailer. At 5:03 p.m., Timothy,

5

with Spurgeon as his passenger, drove the truck and trailer away from the marina parking lot.

On October 13, 2017, a police officer surveilled Timothy's house and observed Timothy leave in his vehicle and return within approximately 20 minutes. Later that day, an officer observed Timothy hose down the front sidewalk, driveway, and front bumper of his vehicle. Timothy placed four trash bags into his vehicle's trunk and drove off.

Police conducted a traffic stop of Timothy and impounded his vehicle for processing pursuant to a search warrant. Inside the vehicle's front area they found a cell phone, a cell phone box with Timothy's phone number written on it, a tie down strap, and a credit card. Also inside the car were a green baseball hat and a water bottle that were similar to the items seen in the October 11, 2017 video surveillance. In the trunk were miscellaneous items, including several trash bags containing rags that smelled like bleach. The rags tested negative for the presence of blood. The officers transported Timothy to their office for photographing and biological evidence processing.

Later that day, the officers executed a search warrant at Timothy's house and saw the detached room was further demolished, including a portion that was completely gutted down to the baseboard at the location of a broken window. The flooring in the corner of the room had been completely removed. The drywall was still intact on certain walls. Inside the main house, the counter where the kitchen sink and its supporting cupboard were located had been completely ripped out in a seemingly haphazard way, as was the flooring in front of the sink. Officers located a bottle of Simple Green cleaning solution and a tan-colored pillowcase.

On October 13, 2017, a police detective spoke with Timothy's neighbors. One neighbor reported seeing an older green truck, possibly a Ford, in

6

Timothy's driveway earlier in the day. That same neighbor reported hearing the sound of power tools being used at Timothy's house. Another neighbor reported seeing two people at the house cleaning and taking boxes out of the garage. On another day, a neighbor saw a male, who had lived at Timothy's house for approximately two months, cleaning the driveway with a power washer.

On October 14, 2017, police officers executed a search warrant at the location where Timothy's brother, Steven, rented space to store his Ford F-150 truck, which matched the truck detectives observed in the video surveillance from October 11, 2017. Inside the truck, the officers located a hardware store's receipt for a one-gallon bottle of Simple Green cleaner, a deck brush, and a heavy-duty large tarp. Officers later discovered video surveillance from a hardware store that showed Timothy purchasing the same items. Officers also found an October 10, 2017, receipt for the Otay Landfill. Steven testified that he gave Timothy permission to use the F-150 truck for work purposes only.

On November 9, 2017, officers executed a search warrant at Spurgeon's residence, where they located the Bass Tracker boat seen in the October 11, 2017 surveillance video. Outside the canvas carport was a plastic 55-gallon drum and cinderblocks.

On December 13, 2017, officers executed search and arrest warrants at Spurgeon's residence, where they found a box of cable wire in the carport area and cinder blocks strewn about Spurgeon's property. That same day, officers arrested Timothy at his residence, where they found a maroon shirt and khaki shorts that matched the clothing Timothy was seen wearing during the October 11, 2017 video surveillance. Officers also located a tan-

colored pillowcase that looked similar to the one found inside the 55-gallon drum that contained Medina's body.

Police never found the cell phone Timothy had used prior to October 9, 2017, when he changed telephones, or Medina's cell phone. Police served search warrants on cell phone providers for the cell phone numbers associated with Timothy, Spurgeon, and Medina.

The last recorded outbound transaction from Medina's cell phone number was placed to Medina's mother at approximately 3:52 p.m. on September 30, 2017. Based on cell tower signals, he was located in the area of Timothy's residence. The incoming calls to Medina's phone number were sent to voicemail beginning at 6:02 p.m. on September 30, 2017. Beginning at 10:57 p.m. on September 30, 2017, until October 4, 2017, at 1:31 p.m., there was no cell site location information for all recorded activities on Medina's telephone account.

Phone records for September 30, 2017, showed Timothy called and sent text messages to Medina between 3:03 p.m. and 3:52 p.m., with Timothy's cell phone connecting to a cell tower that encompassed Timothy's home address. Between 3:55 p.m. and 4:53 p.m., there was no activity on Timothy's cell phone.

Law enforcement downloaded various text message conversations between Greg and Timothy from Greg's phone. In a September 18, 2017, conversation Timothy complained to Greg that Medina was "passed out" in the house. Timothy also said Medina was "a pig," and that Timothy might "kick [Medina] out next month." Timothy and Greg agreed that Medina left trash in the backyard. On September 29, 2017, Timothy wrote Greg that "[Medina], the dirty pig . . . wiped his ass with a sock and threw it in the trash can in the bathroom . . . and he was so drunk yesterday and couldn't

8

even stand up while talking . . . .  Totally disrespected me because I told him not to be super f****** up when [a guest] comes over."

On October 1, 2017, Greg told Timothy that he could not get a hold of Medina for work.  Timothy replied that Medina's car was at the house the night before, but he did not see Medina in the back.  The next day, Timothy lied that he was in Northern California and did not know Medina's whereabouts.

On October 7, 2017, Timothy again lied to Greg, saying he was still in Northern California.  A few hours later, Timothy claimed he was on his way home and was "dealing with something right now"; that he had been out of work and was stressed.

Law enforcement examined Timothy's e-mail account pursuant to a warrant, and found a photo taken on September 16, 2017, of a brown, fuzzy-textured blanket similar to the one found inside the 55-gallon drum with Medina's body.  Four photos showed Medina's credit union account information, including one showing a total deposit of $80,000 into Medina's savings account, and another showing Medina's social security number, date of birth, and phone number.  These photos were deleted from Timothy's e-mail account but were retained on its server.

On September 27, 2017, Timothy had a balance of $6.26 in his bank account.  On September 30, 2017, at 11:56 p.m., Timothy made a $480 deposit into his credit union account.  The next day, Timothy withdrew $400.

In a recorded jail telephone call between inmate M.W. and his girlfriend, M.W. indicated that he had spoken to Spurgeon while the two were in jail together and that Spurgeon had said to M.W., "Yeah dude.  I fuckin' threw a body in the ocean."

9

Timothy and his relative, P.L., worked together at times and had a falling out in early 2017 over money Timothy claimed that P.L. owed him. Before trial, P.L. informed law enforcement that while at a family Thanksgiving gathering in 2017, P.L. told Timothy privately, "What the fuck, dude. What the fuck." Timothy replied, "It was a spur of the moment thing," and moved his hands from side to side while facing his palms up and then down. During a second interview with law enforcement, P.L. reported that Timothy made stabbing motions with his hands and said, "It just happened." Timothy also said something like he was "screwed on this one." P.L. understood that Timothy was referring to Medina's murder.

A San Diego County Sheriff's Department Criminalist tested various items and swabs collected during the investigation for the presence of DNA, comparing the results with reference samples obtained from Timothy, Spurgeon, and Medina. There was "strong support" for inclusion of Timothy's DNA on a swab taken from the back door of Timothy's house; blood was indicated on the swab.

Four swabs from a piece of wall of Timothy's house tested positive for the presence of blood. A mixture of DNA with two contributors was present, and testing indicated "strong support" for inclusion of Timothy's DNA. Medina's and Spurgeon's DNA could not be included or excluded from the DNA mixture.

During a subsequent search of Timothy's residence on December 13, 2017, additional swabs from the walls in Timothy's living room, and from a dining room wall tested positive for the presence of blood, but no further analysis was performed as there was an insufficient amount of DNA on the swabs. Several areas of the detached room reacted positively to a chemical test and could have been the result of cleaning products such as bleach.

DNA test of a knife located in Timothy's kitchen tested positive for the presence of blood, but there was an insufficient amount of DNA for further testing. Six swabs were taken from two carpet pieces from the Bass Tracker boat. DNA testing indicated "strong support" for inclusion of Timothy's DNA on three of the swabs. None of the six swabs tested positive for the presence of blood.

*Defense Case*

Timothy rented the McIntosh Street house in July 2017 from a family friend. According to the property manager, the previous tenants had "trashed" the house. Timothy was charged a reduced rent because he would fix up the property.

In police interviews, Timothy's neighbors did not report hearing any fights or arguments coming from Timothy's residence. One neighbor reported construction going on at another house on McIntosh Street. That same neighbor vaguely recalled seeing a white male drive away in Medina's Cadillac. Another neighbor recalled seeing trash in Timothy's yard that remained there for a while until it was completely cleaned in one day.

E.G. and Medina grew up together and were very close. E.G. testified that the two had a friendly rivalry, but described Medina as a brother. Sometime between late 2016 and early 2017, E.G. and Medina had a falling out, and they never made up. Afterwards, E.G. and Medina "trash-talked" each other on social media, where E.G. made death threats regarding Medina.

In one message, E.G. indicated he did not want to have to kill someone. In another message, E.G. said, "Your boy [Medina] creating problems for no reason [*sic*]. He's fucking with the wrong people. Tell your boy to relax before he finds himself in a grave." E.G. also sent a message that read, "My

11

mom and sister are pissed off because of him, and honestly he put himself [in] a huge hole, and he's over here threatening me for no reason. I put a price on his head." Lastly, E.G. sent a message that said, "He's going to get it. He ain't getting away with this one. He can act tough all he wants. He's going to get blasted." E.G. testified that the messages were merely "shit-talking" and "drunk bullshit."

In August or September 2017, E.G. ran into Medina at a liquor store and asked Medina if they were "cool." Medina responded, "No." The liquor store clerk told the men to relax and to take it outside. When E.G. went outside, Medina had already left the area. Nothing physical happened between the two men on that occasion.

E.G. testified he loved Medina and felt devastated when he learned that Medina was murdered. E.G. was not involved in the murder, and therefore felt disrespected by the insinuation he was involved. He explained that he was at work around the time of the murder. He admitted the prosecution granted him immunity in exchange for his testimony.

Timothy's cousin, M.M., who is an audiovisual technician, testified that in September 2017, Timothy told him that his roommate produced music and Timothy wanted the two to "link up." M.M. went to Timothy's house in September 2017 to meet Medina. M.M. saw that the detached room was unkempt and dirty.

*People's Rebuttal*

Payroll records showed that during the relevant period, E.G. worked at a La Jolla shopping mall during the daytime and at a Point Loma restaurant in the evenings. E.G.'s phone records showed he was in those two areas on September 30, 2017, and October 1, 2017. A review of E.G.'s and Medina's

12

phone records revealed that there were no calls or texts between their phone numbers from April to October 12, 2017.

DISCUSSION

I. *Sufficiency of the Evidence Challenge*

Timothy concedes the evidence might have sufficed to show he and Spurgeon placed the barrel containing Medina's body in the bay, but he contends it was insufficient to support the murder conviction. Specifically, he argues "too many links in the chain necessary to find [him] guilty of murder required speculation and conjecture. In the absence of any evidence regarding the circumstances surrounding Medina's death, any conclusion by the jurors that [he] committed an act resulting in Medina's death would necessarily be based upon speculation rather than substantial evidence."

A. *Applicable Law*

When sufficiency of the evidence is challenged on appeal, we determine whether the record discloses substantial evidence from which, considered as a whole, a reasonable trier of fact could conclude that the crime was committed as charged. (See *People v. Truong* (2017) 10 Cal.App.5th 551, 555-556; accord, *People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We view the evidence in the light most favorable to the judgment and presume every fact in support of the judgment that the jury could have reasonably deduced from the evidence. (See *Truong,* at p. 556.) Substantial evidence is "evidence that is reasonable, credible and of solid value." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) The same standard applies to our review of circumstantial evidence. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1138.) "The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " " (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.) The testimony of a single witness, if believed by

13

the finder of fact, can constitute sufficient evidence. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885; accord*, Truong, supra,* 10 Cal.App.5th at p. 556.) When two or more inferences can reasonably be deduced from the facts, we do not substitute our deductions for those of the trier of fact. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144-145 ["We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency"]; accord, *People v. Ceja,* at p. 1139.)

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be either express, i.e., when a defendant manifests an intention to kill, or implied. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) " 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

B. *Analysis*

Timothy's actions and statements before and after the murder provide abundant circumstantial evidence that he committed it. Timothy was struggling financially and knew Medina had recently received a large sum of money. In the weeks leading up to the murder, Timothy stored to his e-mail account photos related to Medina's credit union account information. The photos included sensitive personal information like Medina's bank account numbers, social security number, date of birth, and phone number. The photos also showed the deposit of $80,000 into Medina's savings account. The

14

jury could infer Timothy stored all of Medina's sensitive personal and banking information because he planned to obtain Medina's money after killing him, as Timothy's bank statements showed that he lacked funds.

The record shows Timothy disliked and disrespected Medina before the murder. On September 18, 2017, Timothy complained to Greg about Medina. Timothy criticized Medina's drinking habits, calling him "a drunk," as well as Medina's lack of cleanliness, calling him "a pig." On September 29, the day before the murder, Timothy again complained to Greg about Medina. Timothy called Medina a "dirty pig," and expressed how upset he was about Medina's meeting with M.M. Timothy said Medina "[t]otally disrespected [him]," because Timothy had told Medina not to be drunk when M.M. came over. M.M.'s testimony corroborated that he went to Timothy's house in September of 2017 to meet Medina, who became intoxicated. The jury could reasonably infer Timothy was motivated to murder Medina out of dislike and disgust following an altercation about Medina's conduct in "disrespecting" Timothy, who ended up killing him.

Timothy also had the opportunity to commit the murder. Telephone records located Timothy and Medina in the vicinity of Timothy's house when Medina made his last phone call. They were arguing, as Medina sounded upset when he called his mother. The stabbing of Medina 66 times, as the medical examiner testified, supports the inference Timothy acted with malice.

After the murder, Timothy twice lied saying he was in Northern California, when in fact, he was in Chula Vista. Moreover, video footage from the October 7th welfare check at Timothy's residence showed he was in the process of demolishing Medina's room. Timothy's neighbors reported hearing power tools being used at Timothy's house, and reported seeing someone

15

matching Timothy's description cleaning with a power washer. Further, Timothy bought cleaning materials and was intercepted taking cleaning rags to the landfill. Timothy also took Medina's body out on a boat and dumped it into the bay. The jury could reasonably infer Timothy was taking great efforts to conceal his actions of stabbing and killing Medina.

Finally, the jury could have concluded based on P.L.'s testimony that at the Thanksgiving gathering, Timothy admitted his involvement in Medina's murder to P.L Timothy told P.L., while making stabbing motions, that it "was a spur of the moment thing," "It just happened," and he (Timothy) was "screwed on this one." Before a judgment can be set aside for insufficiency of the evidence to support a jury verdict, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support it. (See *People v. Redmond* (1969) 71 Cal.2d 745, 755.) As set forth above, there was ample evidence to support Timothy's second degree murder conviction.

We point out that defense counsel in closing invited the jurors to "consider an alternative narrative"—that Timothy came home and found Medina's dead body, "freaked out" and decided not to call the police because of his experience with police. That explanation leaves many questions unanswered, and the jury rejected it by its verdict.[3] On this record, we have no basis for substituting our judgment for the jury's.

II. *Blood Spatter Evidence*

---

[3]   Defense counsel argued to the jury that Timothy was not the murderer: "There are no witnesses, no murder weapon, no real motive. You have to assume and assume that just because [Timothy] made a rash decision to dispose and maybe even cover up some things, that that equates to murder. It does not. You could not convict someone of murder for doing things after the person was already dead."

16

Timothy contends that under Evidence Code section 352, the court erroneously admitted into evidence blood spatter found on a wall during the December 13, 2017 search of his house.  He argues that evidence was irrelevant, more prejudicial than probative, and could only have encouraged jurors to reach a conclusion based on speculation.  He argues the blood spatter evidence did not establish the murder took place at Timothy's house since there was no proof that the blood was even human, or that it was on the walls at the relevant time as it was not observed until the third search of Timothy's residence.

A. *Background*

During the December 13, 2017 search of Timothy's residence, a forensic specialist observed what he believed to be small spots of blood on the walls in the living room and dining room.  Some of the spots tested presumptively positive for blood.  DNA test results revealed that only some of the spots tested positive for blood; however, there was insufficient DNA to analyze.

At trial, the forensic specialist testified that the presumptive test is not limited to human blood and that it could yield a positive result for animal blood.  There was also testimony that Timothy kept at least one dog in the house.

Timothy moved in limine to exclude evidence relating to the blood spatter, arguing that under Evidence Code section 352, the evidence was irrelevant, misleading, and undue prejudice substantially outweighed its probative value.

The prosecutor argued the evidence was relevant because it showed law enforcement was doing a thorough investigation when they located the blood spatter.  She also argued that the blood spatter was relevant and admissible

17

because it was found where the People alleged Timothy had cleaned up evidence of the murder.

Defense counsel argued the evidence was irrelevant, as the People's theory was that the murder occurred in the back room of the house, and the blood spatter was found in different hallways of the house. She argued that it was unknown when or by whom the blood was deposited. Defense counsel also argued that the spatter did not appear to be caused by a murder, as the marks were very small and were not found by law enforcement until a later search. According to defense counsel, the evidence would cause the jury to speculate and was therefore not relevant.

The trial court admitted the evidence, finding it was "relevant to show the thoroughness of [the law enforcement] investigation." It also found the evidence would not be unduly time-consuming, and its probative value outweighed any prejudicial effect.

B. *Applicable Law*

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) The trial court has discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) " 'The prejudice that [Evidence Code] section 352 " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439 (*Doolin*).) " ' " "The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " ' " (*Ibid*.) Moreover, " '[t]he [Evidence]

18

code speaks in terms of *undue* prejudice.  Unless the danger[ ] of undue prejudice . . . " 'substantially outweigh[s]' " the probative value of relevant evidence, [an Evidence Code] section 352 objection should fail.' " (*Ibid*.)  This Court reviews a trial court's ruling under Evidence Code section 352 for abuse of discretion.  (*Doolin*, at p. 437.)

C. *Analysis*

We agree with the People that even if this evidence was erroneously admitted, the overwhelming circumstantial evidence of guilt rendered any error harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, under which the defendant must show, considering the record as a whole, that "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Id*. at p. 836; see *People v. Marks* (2003) 31 Cal.4th 197, 227 [error under Evidence Code section 352 is evaluated under the *Watson* standard].)  The People point out: "The jury already heard evidence of other blood found in [Timothy's] house.  Specifically, the jury learned that [Timothy's] blood was found on the back door of [his] house . . . , and that another wall of [his] house contained [his] blood and possibly [Medina's] blood. . . . Admission of the additional blood evidence found on December 13, 2017, was harmless.  Further, the complained of evidence was not inflammatory given the fact that the forensic specialist admitted that the blood in the living and dining rooms on December 13, was not confirmed to be human, and given the fact that no further DNA analysis was conducted due to an insufficient amount of DNA. . . . Finally, in light of the evidence discussed [ ] above, it is not reasonably probable that the exclusion of the blood spatter evidence would have resulted in a different verdict."  As noted, Timothy disposed of Medina's body, destroyed evidence in Medina's room, and admitted the killing to P.L.

19

### III. *Third-Party Culpability Evidence*

Timothy contends the trial court erroneously excluded third-party culpability evidence that he proffered.

#### A. *Background*

The People moved in limine to exclude Timothy's proposed third-party culpability evidence, which included: (1) evidence related to Medina's hostile relationship with E.G.; (2) testimony by a witness who saw an African-American man sitting in Medina's Cadillac; (3) testimony by a witness who was jogging near the marina and saw two men arguing by a white barrel shortly before police found the barrel in the bay, which raised a question of whether Timothy had dumped the body; and (4) testimony by a witness on a kayak in the bay, who a couple of weeks before Medina's body was recovered saw a worker on a barge handling barrels of different colors, which would again raise a doubt regarding whether Timothy had dumped the body.

The People argued that under *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), the evidence did not rise to the level of creating a reasonable doubt about Timothy's guilt. The People further argued that the evidence should be excluded under Evidence Code section 352, as it had minimal probative value, would mislead the jury, unnecessarily prolong the trial, and confuse the issues.

Timothy responded that he was entitled to present all relevant and probative evidence, the third-party culpability evidence was admissible, and the proposed witnesses could raise a reasonable doubt as to his guilt and the thoroughness of the police investigation.

Following an Evidence Code section 403 hearing the court admitted evidence related to E.G. However, it excluded the other proposed third-party

20

evidence, ruling it was "not going to have a trial to go through every single lead that existed."

B. *Applicable Law*

In *Hall, supra,* 41 Cal.3d 826, the California Supreme ruled: "To be admissible, . . . third-party [culpability] evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Id.* at p. 833.) Courts evaluating culpability must first determine whether the evidence "could raise a reasonable doubt as to defendant's guilt" and then consider its admissibility under Evidence Code section 352. (*Ibid.*) In other words, "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall*, at p. 834.) "[A]n inquiry into the admissibility of such evidence and the balancing required under [Evidence Code] section 352 will always turn on the facts of the case." (*Ibid.*) The *Hall* court emphasized that "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Hall, supra*, 41 Cal.3d at p. 833.)

C. *Analysis*

Here, the trial court did not abuse its discretion in excluding the challenged third-party evidence. Timothy's offer of proof, as set forth above, was devoid of evidence linking the different persons "to the actual perpetration of the crime." (*Hall, supra*, 41 Cal.3d at p. 833.) Neither in the trial court nor on appeal has Timothy elaborated on the proffer of testimony

21

beyond what is set forth above, or pointed to evidence regarding the third-party individuals that would raise a reasonable doubt about his guilt. E.G. testified he threatened to kill Medina; in comparison, the rejected third party culpability evidence was trivial and speculative. The court properly concluded that admitting such evidence would result in multiple trials within the trial, and the proffered evidence was "too speculative to be relevant." (*People v. Lewis* (2001) 26 Cal.4th 334, 373.)

IV. *Consciousness Of Guilt Instructions*

Timothy contends the consciousness of guilt instructions given to the jury—CALCRIM Nos. 362 and 371—were improperly duplicative of the circumstantial evidence instructions, argumentative, and permitted the jurors to draw irrational inferences of his guilt.

A. *Background*

The prosecutor requested the court instruct the jury with CALCRIM No. 362 based on Timothy's false claims after the murder that he was in Northern California. Over defense objection, the court gave the instruction: "If the defendant Timothy Cook made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

The prosecutor requested the trial court instruct the jury with CALCRIM No. 371 because Timothy tried to hide evidence: he destroyed the flooring and walls of the house, changed phones, and attempted to dispose of

22

Medina's body such that it never be found. The court agreed and instructed the jury: "If a defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. If you conclude that a defendant tried to hide evidence, you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty."

B. *Analysis*

Timothy contends that CALCRIM Nos. 362 and 371 were improperly duplicative of the circumstantial evidence instructions and argumentative. But the California Supreme Court has rejected these challenges with regard to their predecessor instructions, CALJIC Nos. 2.03[4] and 2.04[5] respectively: "CALJIC No. 2.03 provides guidance concerning the uses and limitations of circumstantial evidence. That the instruction specifically addresses evidence indicating that a defendant made false or misleading statements concerning

---

[4]    CALJIC No. 2.03, the predecessor instruction to CALCRIM No. 362, provides: "If you find that before this trial [a] [the] defendant made a willfully false or deliberately misleading statement concerning the crime[s] for which [he] [she] is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

[5]    CALJIC No. 2.04, the predecessor instruction to CALCRIM No. 371, provides: "If you find that a defendant [attempted to] [or] [did] persuade a witness to testify falsely or [attempted to] [or] [did] fabricate evidence to be produced at the trial, that conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are for you to decide."

23

the crimes does not alter the circumstance that the instruction addresses the law applicable to the evidence rather than any party's version of the facts. Moreover, as noted above, the instruction is favorable to the defense, because it precludes a jury from convicting a defendant based solely upon his or her dishonest statements relating to the crimes. Consistent with our prior decisions, we reject the contention that the instruction is argumentative." (*People v. Page* (2008) 44 Cal.4th 1, 50-51.) Because of the similarities between the CALJIC instructions and the CALCRIM instructions given here, we apply this analysis and reject Timothy's contentions. (See *People v. Nelson* (2011) 51 Cal.4th 198, 214 & fn. 9; see also *People v. Thornton* (2007) 41 Cal.4th 391, 437-438 [finding CALJIC No. 2.04 a proper statement of the law]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 102 [same].)

Timothy further contends that the court's consciousness of guilt instructions permitted the jury to draw irrational permissive inferences about his guilt. However, we again rely on the California Supreme Court's decision rejecting a similar challenge to CALJIC consciousness of guilt instructions generally: "Finally, defendant contends that consciousness of guilt instructions like CALJIC No. 2.52 (and see CALCRIM No. 362) invite the jury to draw irrational and impermissible inferences with regard to a defendant's state of mind at the time the offense was committed. We have repeatedly rejected this argument." (*People v. Howard* (2008) 42 Cal.4th 1000, 1021.)

## V. *Cumulative Error Claim*

Timothy claims that his trial was rendered fundamentally unfair by the cumulative effect of the claimed errors discussed above.

In a "closely balanced" case, this cumulative effect may warrant reversal of the judgment where "it is reasonably probable" that it affected the

24

verdict.  (*People v. Wagner* (1975) 13 Cal.3d 612, 621.)  However, this was not a close case, and we have rejected all claims of error or found them to be harmless to the extent of any error; therefore, this contention also fails. (*People v. Anderson* (2001) 25 Cal.4th 543, 606.)

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.